THE DEPARTMENT OF REVENUE *ex rel.* THE PEOPLE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM STEINKOPF, d/b/a Buffalo Grove T.V., Defendant-Appellant.

First District (2nd Division) 86—1216

■■■■■■

Opinion filed September 8, 1987.

Terrance M. Jordan, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Patricia Rosen, Assistant Attorney General, of Chicago, of counsel), for appellee.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

The Department of Revenue of the State of Illinois (the State) filed suit against William Steinkopf (Steinkopf) to collect unpaid taxes he was alleged to owe pursuant to the Retailers' Occupation Tax Act (ROTA). (Ill. Rev. Stat. 1983, ch. 120, par. 440 *et seq.*) The trial court found that Steinkopf's retailers' occupation tax (occupation tax) liability had not, as he had alleged, been discharged in bankruptcy. We affirm.

In 1979 Steinkopf purchased a business designated as "Buffalo Grove T.V.," which was engaged in the sale of television sets and other electronic equipment at retail. As a retailer, Steinkopf was subject to the requirements of the ROTA, and, in compliance with the statute, he applied for and obtained a certificate of registration from the State. (Ill. Rev. Stat. 1979, ch. 120, par. 441a.) While operating Buffalo Grove T.V. from July 1979 through April 15, 1981, Steinkopf filed monthly tax returns with the State, but failed to make payments in full for the amounts of liability indicated thereon. The record indicates that the State subsequently sent him 12 notices of delinquency showing that he owed $11,713.28 in unpaid occupation taxes, with interest and penalties as of February 1986 amounting to $11,641.57, for a total debt of $23,354.85.

Because he was experiencing financial difficulties, Steinkopf filed a chapter 13 petition in bankruptcy on February 26, 1981, seeking relief pursuant to 11 U.S.C. sec. 1301 *et seq.* (1982) and listing the State of Illinois as a creditor with respect to the ROTA liability which he

had not paid. On January 20, 1982, the United States Bankruptcy Court for the Northern District of Illinois entered an order discharging Steinkopf's debts pursuant to 11 U.S.C. sec. 1328(b)(1982). The State had not filed a claim, nor did it object to the discharge.

The State filed its complaint at law in August of 1982 seeking to collect the occupation tax debt. On November 30, 1982, without answering the complaint, Steinkopf filed a section 2—619 (Ill. Rev. Stat. 1985, ch. 110, par. 2—619) motion to dismiss, alleging that the debt was discharged in bankruptcy. On December 8, 1983, the trial court denied Steinkopf's motion to dismiss and allowed him 45 days to answer the complaint. After failing to receive an answer within the 45-day period, the State, on April 5, 1983, filed a motion for a default judgment. Over one year later, on April 16, 1984, without either having filed an answer or having responded to the State's motion for a default judgment, Steinkopf filed a section 2—615 (Ill. Rev. Stat. 1985, ch. 100, par. 2—615) motion to strike certain portions of the State's complaint. On April 25, 1984, the trial court entered a default judgment against Steinkopf and struck his section 2—615 motion, noting that Steinkopf's attorney failed to appear for argument thereon. On July 3, 1984, the trial court vacated the default judgment pursuant to Steinkopf's motion requesting such relief.

Finally, on August 8, 1984, Steinkopf filed his answer to the original complaint, interposing the affirmative defense that the State's claim had been discharged in bankruptcy, and asserting a counterclaim alleging that the State wrongfully attached and applied against the ROTA debt $1,125 which Steinkopf contended he was entitled to receive as a tax refund. The State responded by filing a motion to strike Steinkopf's affirmative defense and counterclaim. After considering his reply to the State's motion, the trial court proceeded to strike Steinkopf's affirmative defense and the counterclaim, finding that the occupation tax liability alleged to be owing was not dischargeable in bankruptcy.

On November 29, 1984, the case proceeded to trial; however, the record does not contain any transcript of the proceedings at the trial level. The record does specify, however, that on December 11, 1984, the circuit court judge, after trial and before judgment, ordered a mistrial due to a "substantial error *** made during the proceedings when the defendant's request to consult with his counsel before testifying as an adverse witness was denied," and that said error "totally impaired the ability of [the trial judge] to make a fair, impartial decision." The case was subsequently transferred to the supervising judge of the tax section for reassignment to another judge for trial.

The record indicates that after the reassignment there was no progress on the case until approximately 14 months later when, on February 7, 1986, the State attempted to initiate discovery by filing interrogatories and a request for the production of certain documents. When Steinkopf did not respond to any of the discovery requests, the State filed a motion for the entry of summary judgment, which Steinkopf moved to strike, but to no avail. On April 10, 1986, the trial judge rejected Steinkopf's arguments and entered judgment in favor of the State in the amount of $23,301.45, consisting of $11,585.65 in assessed tax liability and penalties, and $11,513.76 as interest. The trial court also stated that Steinkopf's "motion to dismiss for want of prosecution *** hereby is denied," although the record does not indicate when or how this motion was tendered.

Steinkopf presents the following issues on appeal: (1) whether his ROTA liability was dischargeable in bankruptcy; (2) whether the trial court erred when it denied his motion to dismiss for want of prosecution; and (3) whether the trial court erred in striking his counterclaim.

The order of discharge entered by the Bankruptcy Court states in pertinent part:

"1. [Steinkopf] is released from all dischargeable debts.

2. Any judgment heretofore or hereafter obtained in any court other than this court is null and void as a determination of the personal liability of the debtor with respect to any of the following:

(a) debts dischargeable under 11 U.S.C., sec. 523."

Title 11 U.S.C., sec. 523, states:

"Section 523. Exceptions to Discharge.

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(1) for a tax or a customs duty—

(A) of the kind and for the periods specified in section 507(a)(2) or 507(a)(6) of this title ***." (11 U.S.C. sec. 523 (Supp. 1985).)

The reference in section 523(a) to section 507(a)(6) should have been changed to section 507(a)(7) as redesignated by Public Law No. 98—353. (Editor's Note, 11 U.S.C. sec. 523 (Supp. 1985).) Hence, if the occupation tax is of the type enumerated in either section 507(a)(2) or 507(a)(7), the order of discharge did not extinguish Steinkopf's liability for the tax.

Section 507(a)(2) deals with the priority granted certain unsecured claims having no applicability to this case. However, section 507(a)(7) states:

"(7) Seventh, allowed unsecured claims of governmental units only to the extent that such claims are for—

(A) A tax on or measured by income or gross receipts—

(i) for a taxable year ending on or before the date of the filing of the petition for which a return, if required, is last due, including extensions, after three years before the date of the filing of the petition * * *. [Hereinafter referred to as subsection A.]

* * *

(C) a tax required to be collected or withheld and for which the debtor is liable in whatever capacity. [Hereinafter referred to as subsection C.]

* * *

(E) an excise tax on—

(i) a transaction occurring before the date of the filing of the petition for which a return, if required, is last due, under applicable law or under any extension, after three years before the date of the filing of the petition * * *. [Hereinafter referred to as subsection E.]" (11 U.S.C. sec. 507 (Supp. 1985).)

Accordingly, we must determine whether the occupation tax falls within the ambit of subsection A, subsection C, or subsection E of section 507(a)(7).

A resolution of this issue requires a brief analysis of the occupation tax and its place in the scheme popularly referred to as the Illinois "sales tax," which includes the ROTA as well as the Use Tax Act (Ill. Rev. Stat. 1981, ch. 120, par. 439 *et seq.*). At the time of this litigation, the occupation tax was defined as "[a] tax * * * imposed upon persons engaged in the business of selling tangible personal property at retail at the rate of 4% of the gross receipts from such sales." (Ill. Rev. Stat. 1981, ch. 120, par. 441.) In contrast, the use tax was imposed upon the consumer for "the privilege of using in the State tangible personal property," and such tax was computed "at the rate of 4% of the selling price of such property." (Ill. Rev. Stat. 1981, ch. 120, par. 439.3.) Retailers were required by statute to collect the use tax from purchasers at the time of sale by adding the tax to the selling price of the property (Ill. Rev. Stat. 1981, ch. 120, par 439.3), and the use taxes so collected became a debt owed by the retailer to the State. Ill. Rev. Stat. 1981, ch. 120, par. 439.8.

A retailer was relieved of the duty to pay the use tax to the State only if he had in fact paid the occupation tax with respect to the same transaction. According to section 8:

"The tax herein required to be collected by any retailer pursuant to this Act, and any such tax collected by any retailer shall constitute a debt owed by the retailer to this State, except when such retailer is relieved of the duty of remitting such tax to the Department by virtue of his being required to pay, and his in fact paying, the tax imposed by the 'Retailers' Occupation Tax Act' upon his gross receipts from the same transaction[s]." (Ill. Rev. Stat. 1981, ch. 120, par. 439.8.)

Except for the rate at which the occupation tax and the use tax were levied during the time period covered by this litigation, the provisions of the statutes referred to above remain the same. Therefore, although there are two taxes actuated by the same sale and purchase, only one of the two payments is remitted to the State, and the single payment satisfies both taxes. If a retailer does not pay the occupation tax, he or she must pay the use tax. If the retailer pays his obligation under the ROTA, no obligation for the use tax is incurred.

A retailer who fails to collect the use tax from his or her customers obviously has no such funds to remit to the State. In the instant case, Steinkopf claims he failed to collect the use tax, although there is nothing in the record to support his contention. At any rate, that there were no funds to remit to the State becomes unimportant, for since the use tax is levied on the consumer, Steinkopf has no obligation to pay it from his own funds. However, as just noted, if there are no use tax funds remitted, the retailer is still obligated to pay the occupation tax.

In *Rosenow v. State of Illinois Department of Revenue* (7th Cir. 1983), 715 F.2d 277, the United States Court of Appeals for the Seventh Circuit addressed the question of "whether obligations owed by retail merchants in Illinois pursuant to the Illinois Use Tax Act, *** Ill. Rev. Stat. ch 120, sec. 439.8 *et seq*, are dischargeable in bankruptcy." The court initially noted:

"Both excise taxes and taxes on gross receipts are dischargeable if they become due more than three years prior to the filing of a bankruptcy petition. 11 U.S.C. secs. 507(a)(6)(E) ***, (A). Section 507(a)(6)(C) ([subs]ection C), however, describes certain types of taxes which are to be given priority without any limitation upon the time when they become due ***. These taxes, which may never be discharged, no matter how 'stale' they become, are those 'required to be collected or withheld and for which the debtor is liable in whatever capacity.' " (715 F.2d 277, 279.)

After noting that the use tax expressly states that "[t]he tax hereby

imposed shall be collected from the purchaser by the retailer *** and remitted to the Department," and further, that "[r]etailers shall collect the tax from users by adding the tax to the selling price of tangible personal property" (Ill. Rev. Stat. 1985, ch. 120, par. 439.8), the court proceeded to find that the use tax falls within subsection C and, hence, is nondischargeable, since the statute clearly requires it to be collected, and "the debtor is liable" for it "in whatever capacity." 715 F.2d 277, 280-81.

■■ ■ *Rosenow*, of course, does not decide the question of whether the occupation tax is a subsection C tax. Unlike the use tax, the occupation tax does not fit comfortably within the scope of subsection C. The retailer is not required to collect any money from the consumer in relation to the ROTA. As a matter of fact, our supreme court has held that retailers are "without legal authority to collect from [their] customers *** additional charges for the retailers' occupation tax." (*People's Drug Shop, Inc. v. Moysey* (1943), 384 Ill. 283, 287, 51 N.E.2d 144.) Hence, we hold that Steinkopf's occupation tax liability cannot be deemed indischargeable under subsection C.

■■ ■ Steinkopf devotes his entire reply brief to the argument that since the State at the trial level argued only that the occupation tax liability was nondischargeable under subsection C, the State is precluded from raising any other subsection on appeal. However, as previously noted, there is no transcript in the record in this court of the hearing at which the trial court granted summary judgment in favor of the State, and the order does not specify the grounds upon which the decision of the trial judge is based. The law is well established that the appellant has the clear duty to furnish the record on appeal. (*Sweetwood v. Mahoney* (1981), 93 Ill. App. 3d 788, 792, 417 N.E.2d 874.) It is also clear that assignment of error must be based on the record itself and not merely on the argument of counsel, and that absent any report of proceedings below, the trial judge is assumed to have heard adequate evidence and argument to support the decision rendered. (*Davis v. Allstate Insurance Co.* (1986), 147 Ill. App. 3d 581, 585, 498 N.E.2d 246; see also *In re Marriage of Van Fleet* (1981), 99 Ill. App. 3d 225, 229, 425 N.E.2d 69.) We believe Steinkopf's failure to include the transcript as part of the record on appeal is fatal to his allegation that we are constrained to consider only subsection C in our review since the State argued only that subsection to the trial judge. In the absence of a record it is impossible for this court sitting in review to determine which subsections the trial court took into account; hence, we are compelled to assume that the law pertinent to the court's decision was indeed considered. We

turn, therefore, to the applicability of subsections A and E to the issue of whether Steinkopf's tax obligation was discharged.

In *Rosenow*, the court discussed the occupation tax in relation to the argument of the appellant therein that the

"Illinois Use Tax is essentially a fiction [and] merely a way to collect the equivalent of the Illinois Occupation Tax with respect to purchases out of state of goods for use in Illinois. [According to the appellants, the court should] ignore the form of the Use Tax in favor of the underlying substance of the Occupation Tax and conclude, because the latter is discharged in bankruptcy when stale, that the former should be as well." (*Rosenow v. State of Illinois Department of Revenue* (7th Cir. 1983), 715 F.2d 277, 281.)

The court, however, rejected the appellant's argument, finding that subsection C controlled under the circumstances presented in that case.

In drawing its conclusion, the court, in an *obiter dictum*, made the following comment: "[T]he Occupation Tax is in form a gross receipts tax, levied on the retailer rather than on the purchaser, and as such, presumably dischargeable under [subsection A]." (715 F.2d 277, 281.) The court stated "presumably dischargeable" because the question of dischargeability depended upon a finding that the debt was stale. Nevertheless, albeit *dictum*, this brief passage indicates that the court in *Rosenow* was of the opinion that the dischargeability of the occupation tax should be determined by looking to subsection A.

■■■ However, with all due respect and deference to the United States Court of Appeals, we are not bound to follow its *dicta*, especially when it relates to the interpretation of the statutes of our State. Accordingly, although at first blush subsection A may seem applicable since the occupation tax was measured "at the rate of 4% of *** gross receipts from such sales of tangible personal property made in the course of" the retailer's business (Ill. Rev. Stat. 1981, ch. 120, par. 441), we believe that closer analysis renders subsection A inapposite. Case law consistently indicates that subsection A relates only to certain income tax obligations. (*In re Bradley* (1984), 36 Bankr. 655, 655-56; *In re Kisich* (1983), 28 Bankr. 401, 403; *In re Massoni* (1982), 20 Bankr. 416, 419.) The occupation tax is indisputably not an income tax, but is instead a "tax on the occupation of making retail sales in the State." *Velde Ford Sales, Inc. v. Department of Revenue* (1985), 136 Ill. App. 3d 589, 590, 483 N.E.2d 721.

We find no case authority which addresses directly the proper classification of our occupation tax with regard to the Bankruptcy

Code's discharge provisions. Occupation taxes in general, however, are a type of excise tax, which is defined as "a tax imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege," or a "[t]ax laid on manufacture, sale, or consumption of commodities." (Black's Law Dictionary 506 (5th ed. 1979).) More important, our case law supports the proposition that the Illinois occupation tax is an excise tax. For example, in *People's Drug Shop v. Moysey* (1984), 384 Ill. 283, 286, 51 N.E.2d 144, our supreme court expressly found that "the [occupation tax] is an excise or occupation tax."

▪ In light of this explicit authority, we hold that the occupation tax is not dischargeable under subsection E, provided that the tax debt at issue is not "stale," since stale subsection E type taxes are dischargeable. According to subsection E, a tax is stale if it becomes due more than three years prior to the filing of the bankruptcy petition. The rationale for imposing this time limit seems to be that a taxing authority should not be allowed in a bankruptcy case to collect taxes that are unassessed or uncollected through a lack of due diligence on the part of the State. (*In re Tapp* (1981), 16 Bankr. 315, 322-23.) In the case *sub judice*, Steinkopf filed his bankruptcy petition on February 26, 1978. Accordingly, his tax debt would be stale under subsection E and would thus be dischargeable only if the returns were due on or before February 26, 1978. However, the earliest of Steinkopf's returns for the occupation tax was due on August 31, 1979, for the month of July 1979. Obviously, then, the taxes in this case were not stale, and are therefore not dischargeable in bankruptcy.

▪ We turn our attention now to the second issue Steinkopf presents, namely, whether the trial court erred when it denied his motion to dismiss for want of prosecution. As indicated earlier in this opinion, there was an interim of approximately 14 months between the time that the trial court ordered a mistrial on December 11, 1984, and the time that the State attempted to initiate discovery on February 7, 1986. The record does not disclose whether or not the State initiated any action to further the progress of the litigation during this period. Steinkopf maintains that because the State waited for more than a year after the order of mistrial to do anything to obtain a retrial or a determination otherwise of its claim, the trial court should have dismissed the State's case for want of prosecution. Steinkopf emphasizes that the denial of his motion to dismiss for want of prosecution is particularly egregious in this case because interest was accruing on the tax debt during the 14-month period.

The determination of whether or not to grant a motion to dismiss for want of prosecution is governed by the particular facts of a given case. (*Spancrete of Illinois, Inc. v. Brickman* (1979), 69 Ill. App. 3d 571, 578, 388 N.E.2d 47.) In *City of Crystal Lake v. Sak* (1977), 52 Ill. App. 3d 684, 688, 367 N.E.2d 989, the court adopted the following standard governing dismissals for want of prosecution:

> "While it is true that the courts of this State have long held that the trial courts have the inherent power to dismiss civil cases for inexcusable delay and lack of diligence, the determination of whether there has been a lack of diligent prosecution rests in the sound discretion of the trial court. *** 
>
> 'Dismissal for failure to prosecute is proper only where the plaintiff manifests an intention to thwart the progress of the action to its conclusion, or by some delaying tactic plaintiff fails to progress the action toward its conclusion.' *Green v. Eure* (1973), 18 N.C. App. 671, 672, 197 S.E.2d 599, 601."

The question, therefore, is whether the State has exhibited such inexcusable delay and lack of diligence that the discretionary decision of the trial court cannot in fairness stand.

In support of its argument that the trial court did not abuse its discretion in denying Steinkopf's motion to dismiss for want of prosecution, the State emphasizes that much of the overall delay in the case is attributable to Steinkopf. For example, despite the fact that Illinois Supreme Court Rules clearly require him to make an appearance or file an answer within 30 days of the filing of the complaint (87 Ill. 2d R. 108), Steinkopf failed to take any action until approximately 3½ months after the suit was initiated, and at that time he filed a section 2—619 motion to dismiss. After this motion to dismiss was denied, Steinkopf failed to file his answer within 45 days as directed by the court. Instead, over a year later he filed a section 2—615 motion to dismiss. The court denied the section 2—615 motion and entered a default judgment. After vacating the default, Steinkopf was given another 21 days to respond, and he received a further extension of time before finally filing his answer almost two years after the suit was filed.

 Though, as noted previously, there is nothing in the record or in the State's brief in this court which explains the 14-month delay attributable to the State's inactivity, we do not believe, in view of the various delays he interposed and the obstacles he created, all of which interdicted a rapid termination of the litigation, that Steinkopf merits the relief he sought, *i.e.*, to have the case against him dismissed. Consequently, we hold that the trial judge did not abuse his discretion in

denying Steinkopf's motion to dismiss for want of prosecution.

The final issue that Steinkopf raises is whether the trial court erred in striking his counterclaim. As mentioned earlier, Steinkopf alleged in his counterclaim that the State wrongfully attached and applied against his tax liability the sum of $1,125 which Steinkopf asserted he was entitled to receive as a tax refund. In contrast, the State asserts that it was authorized to attach the $1,125, which represents the amount of the security which Steinkopf was required to post as a retailer pursuant to section 2a (Ill. Rev. Stat. 1983, ch. 120, sec. 441a), which states in part:

> "With respect to security other than [stocks and] bonds (upon which the [State] may sue in the event of a forfeiture), if the taxpayer fails to pay, when due, any amount whose payment such security guarantees, the [State] shall, after such liability is admitted by the taxpayer or established by the [State] through the issuance of a final assessment that has become final under the law, convert the security which that taxpayer has furnished into money for the State, after first giving the taxpayer at least 10 days' written notice, by registered or certified mail, to pay the liability or forfeit such security to the [State]."

It is not clear from the record whether there had been issued "a final assessment that has become final under the law," or whether Steinkopf received statutorily sufficient notice.

However, as we have noted above, assignment of error must be based on the record itself, and that absent any report of proceedings below, the trial judge is assumed to have heard adequate evidence and argument to support the decision rendered (*Davis v. Allstate Insurance Co.* (1986), 147 Ill. App. 3d 581, 585, 498 N.E.2d 246), and we reiterate that it is impossible for this court sitting in review to determine the validity of Steinkopf's contention owing to the insufficiency of the record. In any event, assuming *arguendo* that a "final assessment" within the contemplation of the statute had not been issued, or that the State did not give Steinkopf sufficient notice, this is of no moment, for it is obvious that Steinkopf's counterclaim was entirely dependent upon the viability of the discharge of his debt in bankruptcy as an affirmative defense to his tax liability. If such affirmative defense were valid, Steinkopf's tax liabilities would have been discharged and he would have owed the State nothing; under these circumstances, he could have successfully claimed that the State's attachment of the bond was wrongful. But, as illustrated earlier, Steinkopf's bankruptcy defense is without merit since his occupation tax liability was not discharged. Therefore, the counterclaim must fail,

and any alleged failure of the State to comply with the statute before attaching the bond was harmless error.

Accordingly, we affirm the decision of the trial court.

Affirmed.

BILANDIC and HARTMAN, JJ., concur.