WEBER-STEPHEN PRODUCTS, INC., Plaintiff-Appellant, v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellees.

First District (5th Division)   No. 1—99—2578

Opinion filed August 24, 2001.

894

Thomas H. Donohoe and Melissa A. Connell, both of McDermott, Will & Emery, of Chicago, for appellant.

James E. Ryan, Attorney General, of Chicago (Joel D. Bertocchi, Solicitor General, and Jerald S. Post, Assistant Attorney General, of counsel), for appellees.

JUSTICE THEIS delivered the opinion of the court:

Plaintiff Weber-Stephen Products, Inc. (Weber-Stephen), brought this action against the Illinois Department of Revenue, Douglas L. Whitley, Director of the Illinois Department of Revenue, and Patrick Quinn, Treasurer of the State of Illinois (collectively, the Department), to recover use tax it paid to the Department after its acquisition of an airplane. The circuit court denied its motion for summary judgment and granted judgment in favor of the Department. On appeal, Weber-Stephen argues that the transfer of a used airplane from the original owner, not a retailer of used airplanes, through two intermediate

airplane retailers in exchange for its own smaller aircraft and other consideration in order to qualify for a federal income tax deferral under section 1031 of the Internal Revenue Code (the Code) (I.R.C. § 1031 (1989)), constitutes an isolated or occasional sale as an exception to the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1989, ch. 120, par. 440 *et seq.* (recodified as 35 ILCS 120/1 *et seq.* (West 1998)) and Use Tax Act (Ill. Rev. Stat. 1989, ch. 120, par. 439.1 *et seq.* (recodified as 35 ILCS 105/1 *et seq.* (West 1998)).

●1 When granting summary judgment in favor of the Department, the trial court found:

> "That based on the literal definition of 'sale at retail' found in the first sentence of the Retailers' Occupation Tax Act, *** Plaintiff is subject to Use Tax on its purchase and use of the property at issue because Plaintiff acquired title to that property from someone not qualifying as an occasional seller."

A "sale at retail" under both the Retailers' Occupation Tax Act (ROTA) and the Use Tax Act (UTA or use tax) is defined as "any transfer of the ownership of or title to tangible personal property to a purchaser, for the purpose of use *** for a valuable consideration." Ill. Rev. Stat. 1989, ch. 120, pars. 440, 439.2. While Weber-Stephen concedes that title of the Hawker aircraft was transferred from JB&A Aviation, Inc. (JB&A), to Weber-Stephen, it argues that, despite the transfer of title, the exchange was not a sale. For the reasons that follow, we reject Weber-Stephen's arguments and agree with the trial court that the transfer of the Hawker from JB&A to Weber-Stephen was a sale at retail as defined in the ROTA and UTA and, thus, Weber-Stephen is liable for use tax on this purchase.

Weber-Stephen is an Illinois corporation that manufactures cooking equipment. In 1989, it owned an airplane known as the Westwind, which it used to transport employees and passengers in the course of business. In May 1989, Weber-Stephen contacted JB&A, located in Texas, to assist it in finding and acquiring a larger aircraft. JB&A is an aircraft broker that acts as an intermediary to facilitate the purchase and sale of used aircraft, but it is also a retailer of used airplanes. JB&A located a larger airplane, known as the Hawker, which was owned by The Chase Manhattan Bank, N.A. (Chase). Chase is a national banking association with its principal place of business in New York and is not in the business of selling airplanes at retail. Chase listed the Hawker for sale with Smith/Ellis, a Texas airplane brokerage company. JB&A informed Weber-Stephen of the Hawker's availability in late May 1989.

On June 1, 1989, Chase and Smith/Ellis entered into a purchase agreement whereby Smith/Ellis would purchase the Hawker from

Chase for $4.275 million. Chase was designated as "seller" and Smith/Ellis as "purchaser." In this agreement, Chase stated its intent to effectuate a like-kind exchange pursuant to section 1031 of the Code by exchanging the Hawker for a larger aircraft, the yet-to-be-acquired Canadair Challenger. I.R.C. § 1031 (1989). Chase's obligations under the purchase agreement were conditional upon and subject to its acquisition of the Challenger. Smith/Ellis and Chase also entered into an escrow agreement with Aero Records & Title Company (Aero Records). Both agreements specified that the purchase price funds be transferred directly into an escrow account and applied solely as a trade-in allowance to the later purchase of the Challenger, which was the subject of a separate agreement.

On June 5, 1989, Weber-Stephen and JB&A officers met to discuss the sale. Weber-Stephen signed an offer to purchase the Hawker from JB&A for $2.7 million, plus the trade-in of the Westwind, and delivered the offer to JB&A. Weber-Stephen also delivered a check, made out to JB&A, for a $100,000 deposit on the Hawker to be held in trust pending completion of the transaction. JB&A endorsed the check and mailed it to Aero Records to be held in escrow. The next day, JB&A submitted an offer to purchase the Hawker for $4.275 million to Smith/Ellis, which Smith/Ellis accepted as Chase's agent.

On June 9, 1989, Chase delivered the Hawker to K.C. Aviation in Appleton, Wisconsin, for an inspection pursuant to both JB&A's and Weber-Stephen's offers to purchase. The preliminary inspection report identified the registered owner as Chase and the buyer as Weber-Stephen. On June 13, 1989, Smith/Ellis, as agent for and on behalf of Chase, contacted Weber-Stephen regarding the availability of spare parts for the Hawker. On June 16, 1989, the company that operated the Hawker for Chase authorized certain repairs from the buyer's inspection report prepared for Weber-Stephen.

The transaction closed on June 22, 1989, at the Appleton, Wisconsin, airport where title of the Hawker transferred from Chase to Smith/Ellis to JB&A. JB&A then held title of the Hawker, albeit momentarily, before transferring title to Weber-Stephen. Both airplanes were present and several documents were executed during the closing. Chase and Smith/Ellis executed an aircraft bill of sale for the Hawker listing Chase as seller and Smith/Ellis as purchaser and an acceptance certificate where Smith/Ellis acknowledged delivery of the Hawker.

Smith/Ellis and JB&A entered into an aircraft purchase agreement for the Hawker which specifically referred to the purchase agreement between Chase and Smith/Ellis. The Smith/Ellis-JB&A agreement stated that Smith/Ellis shall sell and deliver the Hawker to

JB&A immediately after Chase sold and delivered the Hawker to Smith/Ellis. The agreement also provided that Smith/Ellis and JB&A had the same rights as the seller and buyer, respectively, in the Chase-Smith/Ellis purchase agreement. However, Smith/Ellis did not undertake any warranties with regard to the Hawker. Smith/Ellis and JB&A also executed an aircraft bill of sale from Smith/Ellis, seller, to JB&A, purchaser.

Weber-Stephen and JB&A then entered into an aircraft exchange agreement for the Hawker, where Weber-Stephen would sell its Westwind to JB&A and pay JB&A $2.8 million. Upon the payment of the purchase price, JB&A would transfer all title documents for the Hawker to Weber-Stephen and Weber-Stephen would transfer all necessary title documents for the Westwind to JB&A. While this agreement did not specify Weber-Stephen's intent to effectuate a section 1031 exchange, an affidavit signed by Weber-Stephen's vice-president as part of this litigation detailed this intent. These funds were to be deposited into an escrow account, pursuant to a separate escrow agreement with Aero Records. The escrow agreement listed Weber-Stephen as buyer, and JB&A as seller, and mentioned both the Westwind and the Hawker.

JB&A executed a warranty bill of sale for the Hawker, where it warranted that it was the legal owner of the Hawker and had clear title. Weber-Stephen signed a certificate of acceptance for the Hawker and JB&A signed a similar certificate for the Westwind pursuant to their exchange agreement. Weber-Stephen also executed a warranty bill of sale for the Westwind, and both JB&A and Weber-Stephen executed an aircraft bill of sale for the Hawker. On June 22, 1989, Aero Records disbursed the proceeds of the escrow account as follows: $4.275 million to Smith/Ellis' escrow account for Chase, minus one-half of the escrow fees, and $25,000 to JB&A, minus one-half of the escrow fees.

Weber-Stephen then brought the Hawker into Illinois. However, Weber-Stephen did not pay any use taxes to the State of Illinois for the use of this airplane. In June 1991, the Department notified Weber-Stephen that it owed $271,950 in past-due use tax, including interest and penalties, for the purchase of the Hawker. Weber-Stephen paid this tax under protest and then filed a complaint for declaratory and injunctive relief pursuant to the State Officers and Employees Money Disposition Act (Protest Act) (Ill. Rev. Stat. 1989, ch. 127, par. 170 *et seq.* (recodified as 30 ILCS 230/1 *et seq.* (West 1998)), seeking an injunction barring the Department from transferring these funds out of the protest account and requiring the Department to refund the monies to Weber-Stephen. By agreed order, the court granted Weber-

Stephen's preliminary injunction enjoining the disbursement of these funds. Weber-Stephen and the Department filed cross-motions for summary judgment. In June 1999, the circuit court granted the Department's motion for summary judgment, denied Weber-Stephen's motion for summary judgment, and dissolved the preliminary injunction. Weber-Stephen then filed a timely notice of appeal and the circuit court entered an order staying the enforcement of its judgment pending the outcome of this appeal.

●2 Summary judgment is appropriate where the pleadings, depositions, admissions, affidavits and exhibits on file present no genuine issue of material fact and show that the moving party is entitled to judgment as a matter of law. 735 ILCS 5/2—1005(c) (West 1998); *Jones v. Chicago HMO Ltd. of Illinois*, 191 Ill. 2d 278, 291, 730 N.E.2d 1119, 1127 (2000). We review a grant of summary judgment *de novo*, construing the evidence in the record strictly against the movant and liberally in favor of the opponent. *Jackson v. TLC Associates, Inc.*, 185 Ill. 2d 418, 423-24, 706 N.E.2d 460, 463 (1998). "When all parties file cross-motions for summary judgment, the court is invited to decide the issues presented as a question of law." *Container Corp. of America v. Wagner*, 293 Ill. App. 3d 1089, 1091, 689 N.E.2d 259, 261 (1997).

●3 Illinois "sales tax" consists of two separate, complementary taxes, the retailers' occupation tax and the use tax. *Brown v. Zehnder*, 295 Ill. App. 3d 1031, 1034, 693 N.E.2d 1255, 1258 (1998). The ROTA imposes an occupational tax upon retailers, persons engaged in the business of selling at retail tangible personal property. Ill. Rev. Stat. 1989, ch. 120, par. 441; *Brown*, 295 Ill. App. 3d at 1034, 693 N.E.2d at 1258. Under ROTA, Illinois retailers are required to remit to the State a percentage of the gross receipts of every retail sale. *Container Corp. of America*, 293 Ill. App. 3d at 1092, 689 N.E.2d at 261. The use tax is assessed the same way and on the same transactions, but the UTA imposes a tax on the purchaser-user of the property for the privilege of using this property in Illinois, regardless of where the sale occurred. Ill. Rev. Stat. 1989, ch. 120, par. 439.3; *Armour Pharmaceutical Co. v. Department of Revenue*, 321 Ill. App. 3d 662, 664, 748 N.E.2d 265, 267 (2001); *Container Corp. of America*, 293 Ill. App. 3d at 1092-93, 689 N.E.2d at 262. The State therefore benefits by taxing in-state retailers and purchases and also out-of-state purchases by consumers for use in Illinois which could not be reached by the ROTA.

When a single purchase occurs, Illinois retailers collect both forms of sales tax from the consumer. However, if the retailer pays the ROTA tax to the State, he or she does not have to pay, and may keep, the use tax. Ill. Rev. Stat. 1989, ch. 120, par. 439.9; *Brown*, 295 Ill. App. 3d at 1034, 693 N.E.2d at 1259. If the retailer is outside Illinois and

therefore has no ROTA or UTA obligations, the purchaser-user in Illinois must pay the use tax directly to the State. Ill. Rev. Stat. 1989, ch. 120, par. 439.10; *In re Stoecker*, 179 F.3d 546, 548 (7th Cir. 1999), *aff'd on other grounds sub nom. Raleigh v. Illinois Department of Revenue*, 530 U.S. 15, 147 L. Ed. 2d 13, 120 S. Ct. 1951 (2000).

●4 The UTA does not apply to out-of-state transactions that would be exempt under the ROTA if the sale occurred in Illinois. Ill. Rev. Stat. 1989, ch. 120, par. 439.3; *Container Corp. of America*, 293 Ill. App. 3d at 1092, 689 N.E.2d at 262. If a seller of personal property is excluded from paying the ROTA tax, despite all elements of the sale occurring in Illinois, then the user of that property is also excluded from the imposition of use tax. Ill. Rev. Stat. 1989, ch. 120, par. 439.3; 86 Ill. Adm. Code § 150.101(c) (1985); *Brown*, 295 Ill. App. 3d at 1034, 693 N.E.2d at 1258. ROTA provides an exception:

> "The isolated or occasional sale of tangible personal property at retail by a person who does not hold himself out as being engaged (or who does not habitually engage) in selling such tangible personal property at retail *** does not constitute engaging in a business of selling such tangible personal property at retail within the meaning of this Act ***." Ill. Rev. Stat. 1989, ch. 120, par. 440.

A nonretailer who makes an occasional or isolated sale does not incur ROTA liability and therefore the purchaser-user does not incur UTA taxes. 86 Ill. Adm. Code §§ 150.101(d), 130.110(a) (1985).

●5 As discussed above, a "sale at retail" under both the ROTA and the UTA is defined as "any transfer of the ownership of or title to tangible personal property to a purchaser, for the purpose of use *** for a valuable consideration." Ill. Rev. Stat. 1989, ch. 120, pars. 440, 439.2. Illinois courts historically have focused on the transfer of title as indicative that a "sale at retail" has taken place. For example, in *Brevoort Hotel Co. v. Ames*, 360 Ill. 485, 489, 196 N.E. 461, 463 (1935), the Illinois Supreme Court applied a literal definition of a sale at retail and determined that the business of serving food in a restaurant constitutes a sale at retail as defined in the ROTA. The court found that the title or ownership of the food remained with the owner of the restaurant until it was served to a customer. Once the customer received the food for his consumption, he had complete control over and disposition of the food and the owner was deprived of any ownership interest. *Brevoort Hotel Co.*, 360 Ill. at 489, 196 N.E. at 463. Thus, this transfer of ownership from the restaurant owner to the customer constituted a sale at retail.

Similarly, our supreme court applied a literal interpretation of the definition to find Illinois florists liable under the ROTA. *O'Brien v. Isaacs*, 32 Ill. 2d 105, 106-07, 203 N.E.2d 890, 891-92 (1965). In that

case, customers ordered flowers from an out-of-state florist, that florist then contacted Illinois florists, and the Illinois florists delivered the flowers from their stock to the intended Illinois addressees. The court rejected plaintiffs' claim that the Illinois florists were merely bailees who did not sell any goods. *O'Brien*, 32 Ill. 2d at 107, 203 N.E.2d at 891. Instead, the court found that the Illinois florists held title to the flowers and then transferred the title and possession to the buyer for a price, constituting a sale at retail within the ROTA definition. *O'Brien*, 32 Ill. 2d at 107, 203 N.E.2d at 891.

In *Sprague v. Johnson*, 195 Ill. App. 3d 798, 803, 552 N.E.2d 436, 439 (1990), the court focused solely on the transfer of title when determining that plaintiff had engaged in sales at retail. The plaintiff received orders from customers for rock, quoted them a price, loaded the rock on to his truck at the quarry and then delivered the rock to the customer. The main issue was precisely when the transfer of title took place and the court found that plaintiff took title to the rock at the quarry and then transferred title to the customer when he unloaded the rock at the customer's location. *Sprague*, 195 Ill. App. 3d at 803, 552 N.E.2d at 439. Thus, the court concluded that plaintiff conducted sales at retail and was liable for ROTA taxes.

The Seventh Circuit also addressed this issue in *In re Stoecker*, 179 F.3d 546, 549-50 (7th Cir. 1999). In analyzing the transfer of an airplane from the original seller to an intermediate retailer and then to the retailer's financing affiliate before resting with the ultimate buyer, the court focused on who held title and to whom title was transferred. The court simply held that "JPA [retailer] took title; JPA is a retailer; therefore use tax was due on the subsequent transfer of title by JPA to Chandler [ultimate buyer]." *Stoecker*, 179 F.3d at 550.

In the present case, all parties concede that title was transferred from JB&A to Weber-Stephen. However, Weber-Stephen argues that, despite the transfer of title of the Hawker from JB&A to Weber-Stephen, the true nature of the transaction was a sale from Chase, the original owner, while Smith/Ellis and JB&A were merely intermediaries necessary to effect a like-kind exchange under section 1031 of the Code. I.R.C. § 1031 (1989). Because Chase is not a retailer engaged in the business of selling used airplanes, Weber-Stephen contends, this transaction qualifies as an isolated or occasional sale, exempting Weber-Stephen from paying use tax.

While Weber-Stephen contends that JB&A was acting as its agent, the terms employed by the parties in their documents refute this argument. Each party executed a warranty bill of sale and certificate of acceptance for the Hawker and Westwind, identifying JB&A as the seller of the Hawker and buyer of the Westwind and Weber-Stephen as

the buyer or purchaser of the Hawker and seller of the Westwind. The aircraft bill of sale for the Hawker described Weber-Stephen as the purchaser and JB&A as the seller. Similarly, the aircraft exchange agreement between JB&A and Weber-Stephen referred to JB&A as the seller and Weber-Stephen as the buyer.

In the exchange agreement, Weber-Stephen agreed to transfer the Westwind and $2.8 million to JB&A for the Hawker. Significantly, JB&A undertook a warranty of title on the Hawker. It warranted to Weber-Stephen that, at the time of the closing, JB&A would be the lawful owner of the Hawker and the airplane would be free and clear of any and all liens, encumbrances, security interests, and claims. JB&A therefore exposed itself to potentially substantial liability for any title problems with the Hawker. Their exchange agreement did not include any intent on the part of Weber-Stephen to facilitate a section 1031 exchange with Chase, but included a merger integration clause, stating that this contract contained the entire agreement between the parties. The escrow agreement between JB&A, Weber-Stephen and Aero Records provided that, upon the closing of the Hawker and Westwind, Aero Records would disburse the purchase price money as follows: one-half of the escrow fees to Aero Records and all remaining funds to JB&A's corporate bank account. There is no restriction on JB&A's use of these funds. Moreover, neither the exchange agreement nor the escrow agreement refers to Chase or Smith/Ellis or contains any language that JB&A was acting as an intermediary or agent for Weber-Stephen in the purchase of the Hawker.

Our review of the documents between Chase and Smith/Ellis serves to strengthen the Department's case and confirms that the transfer from JB&A to Weber-Stephen was a sale. In its documents, Smith/Ellis is consistently referred to as the "agent for Chase." Further, their agreements reflect Chase's intent to effectuate the like-kind exchange under section 1031 and Smith/Ellis' role as merely Chase's agent in this transaction. Smith/Ellis did not have any control over the purchase price funds because this money could only be applied towards the purchase of the Challenger for Chase. The Smith/Ellis-JB&A documents specifically referenced Smith/Ellis' agreement with Chase. In the Smith/Ellis-JB&A agreement, Smith/Ellis agreed to sell and deliver the Hawker to JB&A immediately after Chase sold and delivered the plane to Smith/Ellis pursuant to the Chase-Smith/Ellis purchase agreement. The JB&A-Weber-Stephen agreement contains no such provisions.

Moreover, Smith/Ellis did not undertake any warranties of title or other warranties concerning the Hawker in its purchase agreement

with JB&A, further cementing its role as merely Chase's agent. Because these warranties were specifically excluded by Smith/Ellis, JB&A was on notice that Smith/Ellis did not claim to have title and was purporting to sell only such title it had. *Kel-Keef Enterprises, Inc. v. Quality Components Corp.*, 316 Ill. App. 3d 998, 1015, 738 N.E.2d 524, 536 (2000). The obligations of title were imposed on the principal, Chase, and not on its agent, Smith/Ellis, and, thus, Smith/Ellis would not be liable to JB&A for any title problems. Further, while JB&A paid one-half of the escrow fees out of its own pocket, Smith/Ellis paid the other half of the fees from Chase's account. Thus, in contrast to Weber-Stephen and JB&A, Chase and Smith/Ellis clearly described Smith/Ellis' agency and intermediary role.

Most importantly, in consideration for the Hawker, JB&A received the Westwind and $2.8 million. While it then passed the money to Smith/Ellis and Chase, the Westwind remained in JB&A's inventory and JB&A could sell it for a potentially substantial profit. Smith/Ellis, on the other hand, did not keep an airplane and only funneled the sale proceeds into an escrow account created to purchase a Challenger in order to effect a deferred section 1031 exchange. Smith/Ellis was merely a conduit through which to pass the money and acted to facilitate the sale of the Hawker and purchase of the Challenger for Chase.

We find that JB&A did not simply facilitate the purchase of the Hawker as Smith/Ellis did. JB&A transferred title to the Hawker for the valuable consideration of the Westwind and, thus, acted as a retailer of used airplanes.

Weber-Stephen also argues that, despite the language of the documents identifying a sale between it and JB&A and despite the fact that title of the Hawker passed from JB&A to Weber-Stephen, the parties intended to facilitate a like-kind exchange under section 1031 of the Code and, thus, are excluded from use tax liability. Weber-Stephen contends that the terms and provisions of the agreements, the buyer-seller terminology, warranty provisions, etc., and the transfer of title from JB&A to Weber-Stephen were included only because they were required under the section 1031 exchange. Weber-Stephen also argues that intermediaries are commonly used in a section 1031 exchange and, thus, JB&A's momentary holding of title did not have independent significance and this court should not rely on it.

Typically, the sale of an asset which results in a gain or loss must be recognized in the year the property is sold or exchanged. I.R.C. § 1001 (1989). Section 1031, however, allows a taxpayer to defer the recognition of gain or loss on this property and provides:

> "No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if

such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment." I.R.C. § 1031(a)(1) (1989).

Weber-Stephen sought to exchange its Westwind for the Hawker and therefore defer any capital gains tax.

•6 We find that Weber-Stephen's contention is fundamentally flawed. Weber-Stephen is unable to direct us to any portion of the Illinois tax code or case precedent for the proposition that Illinois use tax liability should be excused when a taxpayer receives a federal tax benefit in the same transaction. Weber-Stephen must pay state taxes on the purchase, unless it meets one of the tax exemptions provided in the Code.

For the foregoing reasons, we hold that the transfer of the Hawker from JB&A to Weber-Stephen was a sale under the ROTA and the UTA and does not qualify under the isolated or occasional sale exemption. Weber-Stephen is thus liable for use tax. Accordingly, we affirm the circuit court's granting of summary judgment in favor of the Department and against Weber-Stephen.

Affirmed.

QUINN, P.J., and GREIMAN, J., concur.