FIRST DIVISION

June 2, 2003

No. 1-02-0379

JM AVIATION, INC., ) Appeal from the

) Circuit Court of

Plaintiff-Appellant, ) Cook County

)

) No. 01 L 50537

)

THE DEPARTMENT OF REVENUE, ) Honorable

) John A. Ward,

Defendant-Appellee. ) Judge Presiding.

JUSTICE SMITH delivered the opinion of the court:

This is an action for administrative review of the Illinois Department of Revenue's (the Department) determination that plaintiff JM Aviation, Inc. (JM Aviation), owed state use tax on its purchase of a used airplane.  The circuit court affirmed the Department.  On appeal, JM Aviation contends that is does not owe any use tax, alleging that the purchase was an isolated or occasional sale and, thus, constituted an exception to the Retailers' Occupation Tax Act (35 ILCS 120/1 
et
 
seq
. (West 1996)) (hereinafter ROTA) and Use Tax Act (35 ILCS 105/1 
et
 
seq
. (West 1996)) (hereinafter UTA).  Specifically, JM Aviation argues that it purchased the airplane from an entity that neither held itself out as a seller of aircraft nor habitually engaged in the selling of aircraft.  No issues are raised on the pleadings.  For the reasons that follow, we affirm.

FACTS

In 
Weber-Stephen Products, Inc. v. Department of Revenue
, 324 Ill. App. 3d 893 (2001), this court previously described the statutory framework of what is commonly known as the Illinois sales tax, which consists of two separate, complementary taxes, 
i.e.
, the retailers' occupation tax and the use tax.  

"The ROTA imposes an occupational tax upon retailers, persons engaged in the business of selling at retail tangible personal property.  [Citations.]  Under ROTA, Illinois retailers are required to remit to the State a percentage of the gross receipts of every retail sale.  [Citation.]  The use tax is assessed the same way and on the same transactions, but the UTA imposes a tax on the purchaser-user of property for the privilege of using this property in Illinois, regardless of where the sale occurred.  [Citations.]  The State therefore benefits by taxing in-state retailers and purchases and also out-of-state purchases by consumers for use in Illinois which could not be reached by the ROTA.

When a single purchase occurs, Illinois retailers collect both forms of sales tax from the consumer.  However, if the retailer pays the ROTA tax to the State, he or she does not have to pay, and may keep, the use tax.  [Citations.]  If the retailer is outside Illinois and therefore has no ROTA or UTA obligations, the purchaser-user in Illinois must pay the use tax directly to the State.  [Citations.]

The UTA does not apply to out-of-state transactions that would be exempt under the ROTA if the sale occurred in Illinois.  [Citations.]  If a seller of personal property is excluded from paying the ROTA tax, despite all elements of the sale occurring in Illinois, then the user of that property is also excluded from the imposition of use tax.  [Citations.]  ROTA provides an exception:

'The isolated or occasional sale of tangible personal property at retail by a person who does not hold himself out as being engaged (or who does not habitually engage) in selling such tangible personal property at retail *** does not constitute engaging in a business of selling such tangible personal property at retail within the meaning of the Act ***.'  [Citation.]

A nonretailer who makes an occasional or isolated sale does not incur ROTA liability and therefore the purchaser-user does not incur UTA taxes.  86 Ill. Adm. Code §§150.101(d), 130.110(a) (1985).

*** [A] 'sale at retail' under both the ROTA and the UTA is defined as 'any transfer of the ownership of or title to tangible personal property to a purchaser, for the purpose of use *** for a valuable consideration.' [Citation.]  Illinois courts historically have focused on the transfer of title as indicative that a 'sale at retail' has taken place."  
Weber-Stephen Products, Inc.
, 324 Ill. App. 3d at 898-99.

JM Aviation is an Illinois corporation and was established by its owner, John Melk, to hold title to aircraft.  In 1992, JM Aviation purchased a Westwind II airplane (Westwind) from Southern Aircraft Services, Inc. (SAS), a Florida corporation that owns, manages and maintains various aircraft which it then leases to various companies affiliated with SAS.

JM Aviation decided to replace its Westwind with a Gulfstream GII aircraft (Gulfstream) owned by Montgomery Ward & Company (Ward) and, in July 1995, entered into an agreement with Ward to purchase the Gulfstream for $3.2 million.  Because JM Aviation had not yet found a buyer for its Westwind, JM Aviation structured the disposition of the Westwind in a manner that permitted JM Aviation to defer, for federal income tax purposes, the recognition of the gain that would be realized by selling the Westwind.  Such a transaction, commonly referred to as a like-kind exchange, required the use of an intermediary titleholder for the Gulfstream until a buyer for the Westwind was found.  SAS was used as the intermediary to facilitate the exchange.

In July 1995, JM Aviation and SAS entered into a contract whereby JM Aviation assigned its right to purchase Ward's Gulfstream to SAS; JM Aviation acquired an option to purchase the Gulfstream from SAS; and JM Aviation agreed to sell its Westwind to SAS in partial payment for the Gulfstream.  Because SAS did not intend to acquire the Gulfstream for its own use, JM Aviation agreed to lease the Gulfstream from SAS until JM Aviation purchased it.  Moreover, JM Aviation agreed not to exercise its option to purchase the Gulfstream until a buyer was found to purchase the Westwind from SAS.  JM Aviation agreed to make a $1.7 million lease deposit with SAS and loan SAS $1.5 million (the expected sale price of the Westwind).

In September 1995, SAS used the $3.2 million it received from JM Aviation to purchase the Gulfstream, which it then leased to JM Aviation.  In March 1996, a buyer purchased the Westwind from SAS, and JM Aviation exercised its option to acquire the Gulfstream from SAS in exchange for title to the Westwind and a $1.7 million credit for the lease deposit.  JM Aviation did not pay Illinois use tax on its acquisition of the Gulfstream.  In 1999, the Department notified JM Aviation that it owed $224,000 in past-due use tax for the purchase of the Gulfstream.

On November 22, 2000, a hearing was held before an administrative law judge (ALJ).  JM Aviation contended that it was not liable for the use tax, alleging that it purchased the Gulfstream from Ward, a nonretailer, rather than SAS.  In the alternative, JM Aviation contended that if SAS was deemed the seller, SAS was not a retailer and the Gulfstream transaction was not a retail sale.  JM Aviation also contended that the Department overstated the amount of use tax due.  The Department submitted its audit correction and/or determination of tax due, dated October 7, 1999, which established its 
prima
 
facie
 case.  See 35 ILCS 120/4 (West 1996); 
Elkay Manufacturing Co. v. Sweet
, 202 Ill. App. 3d 466, 470 (1990).  The Department and JM Aviation stipulated to numerous exhibits, including the Department's tax specialist's audit comments, which stated:

"The occasional sale exemption claimed by the taxpayer does not apply when a person purchased an item of tangible personal property with the intent of reselling it to a purchaser for use or consumption. In this case, SAS is a retailer who purchased the aircraft with the intent of reselling it to JM [Aviation]; consequently, the occasional sale exemption does not apply."

Evidence as to the nature of SAS's business was found in several exhibits stipulated to by the parties.  A title search of the Westwind indicated that JM Aviation purchased that Westwind from SAS in 1992.  When JM Aviation closed on its purchase of the Gulfstream in March 1996, SAS was listed as the seller in that transaction.  SAS also sold three aircraft in 1997.

Further, a letter to the Department from the Florida Department of Revenue (Florida Department), dated October 30, 1998, stated that SAS "is a registered Sales and Use Tax business under kind 
code 23, which includes motor vehicle dealers, trailers, campers (sales and rentals)."  However, a letter from the Florida Department dated May 31, 2000, explained that, because Florida treats lessors as dealers, an entity seeking a sales tax exemption with respect to a leasing business obtains a Florida dealer's license.  The Florida Department also stated that Florida statutes, which tax leases based on the rental price, define "dealer" to include any person who leases or rents tangible personal property for a consideration.

In addition, schedule B of SAS's 1996 United States income tax return listed SAS's business activity as "Aircraft" and its product or services as "Leasing/Sales."  Moreover, schedule K of SAS's 1995 United States income tax return listed SAS's business activity as "Aircraft Sales" and product or service as "Sales."  However, SAS's 1996 depreciation and amortization schedule noted that the "business or activity to which this form relates" was "Aircraft Leasing Activity," and a form for reporting rental activity income or loss also listed "Aircraft Leasing Activity."

JM Aviation also presented the testimony of two witnesses.  Cris Branden, SAS's vice-president, treasurer and assistant secretary, testified that from 1995 through 1997 SAS owned four or five aircraft and that its primary business was the leasing of aircraft to another leasing company, which then subleases the aircraft to various companies owned by SAS's owner, Wayne Huizenga.  Branden testified that SAS staff occasionally, as an accommodation, helped Huizenga's business associates who were looking to sell or acquire aircraft, often earning a finder's fee for such transactions.  SAS also acted, "on very rare occasions," as a broker to sell one of its business associate's aircraft.  SAS received $96,774 in commissions in 1995, $125,663 in commissions in 1996, and no commission in 1997.

Branden also testified that SAS neither employed sales people engaged in selling airplanes, held an inventory of aircraft for sale, nor advertised to sell aircraft.  Branden testified that SAS only bought and sold aircraft for purposes of rotating or upgrading its leasing fleet.  On cross-examination, Branden testified that he was familiar with all SAS's sales and purchases but was not aware that JM Aviation had bought its Westwind from SAS in 1992.  Branden also stated that he was not aware that SAS had a website which listed a Boeing 737-200 for sale but explained that the Boeing was part of SAS's lease pool.  The Department, however, did not present any evidence to establish that SAS either had a website or had advertised such a sale.

Karen McAdam, a financial advisor to John Melk, the owner of JM Aviation, testified that JM Aviation purchased the Westwind from SAS in 1992.  McAdam also testified that Melk owned numerous aircraft and held them in different corporations for liability purposes.  McAdam advised Melk to use a like-kind exchange to defer the tax on the gain on the Westwind.  According to McAdam, Melk chose to use SAS as the intermediary for the exchange because Huizenga, SAS's owner, was Melk's friend and business associate.

After briefing, the ALJ ruled in favor of the Department and determined that JM Aviation was subject to the use tax.  The ALJ rejected JM Aviation's argument that the Gulfstream transaction was actually a purchase from Ward, a nonretailer, rather than SAS.  Moreover, the ALJ determined that SAS was a retailer of aircraft, finding that JM Aviation failed to demonstrate that SAS either (1) did not hold itself out as being engaged in the sale of aircraft or (2) did not habitually engage in the sale of aircraft.  The ALJ, however, reduced the amount of tax owed by JM Aviation by crediting the sale of the Westwind, the proceeds of which were used to purchase the Gulfstream.

The ALJ stated that Branden's testimony–
i.e.
, that SAS did not maintain an inventory of aircraft for resale, did not advertise aircraft for sale at retail, did not employ any sales people and did not otherwise hold itself out as a retailer–conflicted with evidence indicating that SAS was a retailer and/or habitually engaged in selling aircraft.  Specifically, the ALJ noted that SAS sold aircraft as part of its aircraft brokerage business and as an accommodation to its customers and may have advertised an aircraft for sale on the Internet.  Moreover, SAS  was a registered aircraft dealer in Florida even though such registration also applied to entities engaged in lease transactions under Florida law.  In addition, SAS's 1996 federal income tax return defined its business as "Leasing/Sales" and 1995 Federal income tax return identified its business as "Aircraft Sales."  The ALJ stated that the ambiguities in the record created by the conflicting evidence made it particularly important for JM Aviation to successfully rebut any inference that SAS was a retailer.

The ALJ noted that JM Aviation presented SAS's income tax returns, which indicated that SAS depreciated the aircraft it owned, to support its claim that SAS did not maintain an inventory of aircraft for sale.  Nevertheless, JM Aviation did not introduce SAS's Florida dealer's license, which might have conclusively established the purpose for which SAS had obtained that license.  Moreover, JM Aviation failed to introduce SAS's books and records to establish the frequency of its aircraft sales or to support Branden's testimony that SAS infrequently brokered such sales of aircraft on behalf of clients as an accommodation.  JM Aviation also failed to introduce SAS's Florida sales tax returns, which might have shown what aircraft sales transactions were made, or other documentary evidence to substantiate the claim SAS only sold aircraft that it no longer needed for its leasing business.

The ALJ concluded that Branden's largely unsubstantiated testimony and SAS's income tax returns concerning depreciation of aircraft involved in its leasing operation, without corroborating books and records, were insufficient to overcome the Department's 
prima
 
facie
 case.

On March 12, 2001, the Director of the Department accepted the ALJ's recommended decision, making it a final administrative determination.  On April 2, 2001, the Department issued a final assessment for sales and use tax, finding that JM Aviation owed $131,810 in tax, a $250 late filing penalty and interest in the amount of $54,988.83.

JM Aviation timely filed a complaint for administrative review in the circuit court of Cook County, asserting that the Department erred by concluding that SAS was a retailer and by considering the facially taxable form of the transaction rather than its nontaxable substance.  The circuit court affirmed the Department's decision to tax JM Aviation.  JM Aviation then filed a timely notice of appeal
.

ANALYSIS

JM Aviation contends that the Department held JM Aviation to an improper evidentiary standard and, thus, erred in applying the Illinois use tax, the Department's regulations and case law to the facts developed at the administrative hearing to determine that SAS was a retailer.  On appeal, this court reviews the administrative agency's decision and not that of the circuit court.  
XL Disposal Corp. v. Zehnder
, 304 Ill. App. 3d 202, 207 (1999).  An administrative agency's decisions on questions of fact are entitled to deference and are reversed only if against the manifest weight of the evidence.  
XL Disposal Corp.
, 304 Ill. App. 3d at 207.  However,  questions of law are not entitled to the same deference and are reviewed 
de
 
novo
.  
 XL Disposal Corp.
, 304 Ill. App. 3d at 207.  Although JM Aviation asserts that the 
de
 
novo
 standard of review applies because the only question is the legal conclusion to be drawn from undisputed facts, JM Aviation clearly disputes the ALJ's factual determinations and the way the ALJ weighed the evidence before him.

The ALJ's determination was, in part, factual because it involved considerations of witness credibility and the nature of SAS's business.  The ALJ was required to make certain factual findings and analyze the evidence to discern whether SAS's conduct or its documents suggested that SAS held itself out as a seller of aircraft or habitually engaged in such sales.  In light of these analyses and the ultimate legal question as to whether the purchase fit under the "occasional sale" exception of the use tax, we characterize the Department's ruling as a mixed question of law and fact.  
JI Aviation, Inc. v. Department of Revenue
, 335 Ill. App. 3d 905, 913-14 (2002).  Accordingly, we apply the largely deferential clearly erroneous standard.   
JI Aviation, Inc.
, 335 Ill. App. 3d at 913-14.  Under the clearly erroneous standard, we will reverse the Department's ruling "'when although there is evidence to support it, [we are] *** left with the definite and firm conviction that a mistake has been committed.'"  
AFM Messenger Service, Inc. v. Department of Employment Security
, 198 Ill. 2d 380, 393 (2001), quoting 
United States v. United States Gypsum Co.
, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

A statutory exemption to taxation such as that sought by JM Aviation is to be strictly construed in favor of taxation.    
XL Disposal Corp.
, 304 Ill. App. 3d at 207.  Taxpayers seeking exemptions bear the burden of proving clearly and conclusively that they are entitled to the exemptions.    
XL Disposal Corp.
, 304 Ill. App. 3d at 208.  Further, in reviewing the Department's decision, all facts and debatable questions must be construed in favor of taxation.  
XL Disposal Corp.
, 304 Ill. App. 3d at 208.

In order for a use tax to be imposed, it must be shown that tangible personal property has been (1) purchased at retail; and (2) purchased from a retailer.  35 ILCS 105/3 (West 1996).  The UTA defines a "sale at retail" as "any transfer of the ownership of or title to tangible personal property to a purchaser, for the purpose of use * * * for a valuable consideration."  35 ILCS 105/2 (West 1996).  The evidence established, and JM Aviation does not dispute, that JM Aviation purchased the Gulfstream at retail where JM Aviation purchased the Gulfstream for use rather than resale (
Mobil Oil Corp. v. Johnson
, 93 Ill. 2d 126, 134-35 (1982)), and title of the Gulfstream transferred from Ward to SAS and then to JM Aviation (
In re Stoecker
, 179 F.3d 546, 549-50 (7th Cir. 1999); 
Webster-Stephen Products, Inc.
, 324 Ill. App. 3d at 901-02).  JM Aviation argues, however, that the imposition of the use tax was improper because the UTA also requires a showing that the purchase was made from a retailer.  JM Aviation claims that it sufficiently rebutted the Department's 
prima
 
facie
 case that SAS was a retailer.

The term "retailer" is defined in section 2 of the UTA as "[a] person who holds himself or herself out as being engaged (or who habitually engages) in selling tangible personal property at retail is a retailer hereunder with respect to such sales."  35 ILCS 105/2 (West 1996).  The Department's regulations further define habitual sales as:

"Any person who habitually engages in selling tangible personal property for use or consumption, or who, in any manner or at any time, advertises, solicits, offers for sale or holds himself out to the public to be a seller of tangible personal property for use or consumption other than in the course of engaging in a service occupation is engaged in the business that is taxed by the Act, provided that such person is engaged in such business in this State."  86 Ill. Adm. Code §130.115 (1996).

On appeal, JM Aviation contends that the Department held JM Aviation to an improper evidentiary burden to prove that SAS was not a retailer.  Specifically, JM Aviation argues that the Department improperly relied on 
Mel-Park Drugs, Inc. v. Department of Revenue
, 218 Ill. App. 3d 203 (1991), to require JM Aviation to produce SAS's books and records to establish that SAS was not a retailer.  JM Aviation claims that 
Mel-Park Drugs, Inc.
 involved the issue of the amount or proper calculation of the tax, rather than whether the transaction was taxable.  JM Aviation asserts that 
Mel-Park Drugs, Inc.
 is not applicable to the instant appeal and does not indicate the type of proof that might have been found in SAS's books and records to establish the negative fact that SAS was not a retailer.  We disagree.

Mel-Park Drugs, Inc.
 is not distinguishable on the basis offered by JM Aviation.  In 
Mel-Park Drugs, Inc.
, the taxpayer sold different categories of goods and services (like newspapers and pharmacist services) that had different tax consequences and then failed to provide daily receipts to establish which categories applied to the total amount of sales reported.  218 Ill. App. 3d at 211.  This court held that the evidence presented by the taxpayer–its bookkeeper's monthly tally of the daily receipts–failed to rebut the Department's 
prima
 
facie
 case because the amount of tax owed depended on which sales were subject to tax.  
Mel-Park Drugs, Inc.
, 218 Ill. App. 3d at 219-20.

A review of the record indicates that the Department merely cited 
Mel-Park Drugs, Inc.
, in addition to other cases, for the well-established propositions that the burden is on the taxpayer to rebut the 
prima
 
facie
 case of the Department; that oral testimony denying tax liability is not sufficient to rebut the Department's 
prima
 
facie
 case; and that the taxpayer must present sufficient documentary support for its assertions.  
See
 
Copilevitz v. Department of Revenue
, 41 Ill. 2d 154, 156-57 (1968) (taxpayer who operated a grocery store and claimed deductions for sales tax, and testified, along with his brother, that sales were to out-of-state customers or for purposes of resale, failed to supply documentary evidence to satisfy his burden of showing that the Department's corrected return was incorrect); 
Estate of Young v. Department of Revenue
, 316 Ill. App. 3d 366, 376-77 (2000) (the finding that the taxpayer failed to rebut the 
prima
 
facie
 case of wilful nonpayment was not clearly erroneous, notwithstanding the fact that the taxpayers had a system for paying the taxes and a policy of paying the taxes before they paid wages and their vendors); 
A.R. Barnes & Co. v. Department of Revenue
, 173 Ill. App. 3d 826, 832-34 (1988) (where taxpayer's explanation for commingling service occupation tax charges and warehousing charges was unpersuasive and where taxpayer failed to introduce any statements or affidavits from its customers supporting its explanation of the charges, plaintiff failed to rebut the Department's 
prima
 
facie
 case).

In addition, the ALJ specifically listed several types of documents that JM Aviation failed to present to support Branden's testimony and rebut the Department's 
prima
 
facie
 case, 
i.e.
, SAS's Florida dealer's license, documents of SAS to establish the frequency of sales SAS made on behalf of clients as an accommodation in connection with its aircraft brokerage business, SAS's Florida sales tax returns, and documentation to support SAS's claim that it only sold aircraft it no longer needed for its leasing business.  We, therefore, reject JM Aviation's claim that it was held to an improper evidentially standard.

Next, JM Aviation contends that the Department wrongfully decided that SAS was a retailer based on the fact that SAS maintained a Florida aircraft dealer's license.  JM Aviation argues that 
the ALJ "completely disregarded" Cris Branden's testimony and the May 2000 letter from the Florida Department, which JM Aviation claims established that SAS held the Florida aircraft dealer's license to exempt its purchases of aircraft for its leasing business from sales tax.  We disagree.

The record is clear that the ALJ specifically addressed the Florida Department's May 2000 letter and Branden's testimony concerning SAS's Florida aircraft dealer's license.  The Florida Department's letter was hardly conclusive evidence that SAS limited its business operations to leasing activity, because the Florida Department simply stated that, under Florida law, lessors and dealers register under the same license.  Moreover, as noted above, the ALJ found that Branden's testimony concerning the limited nature of SAS's leasing business was unsubstantiated and contradicted by other evidence.  Specifically, Branden, the vice-president, treasurer and assistant secretary of SAS, a relatively small corporation holding only four or five aircraft, did not testify credibly that SAS did not engage in retail sales where Branden did not even know that SAS sold a Westwind to JM Aviation in 1992.

Next, JM Aviation contends that the Department relied on "cryptic business purpose notations" in SAS's federal income tax returns to determine that SAS was a retailer and "ignored" information contained in those same tax returns supporting SAS's position that it did not engage in retail sales.  Specifically, although the tax returns labeled SAS's business as "Leasing/Sales" and "Aircraft Sales," the returns showed that SAS depreciated the aircraft in its leasing fleet.  We disagree.

The record is clear that the ALJ acknowledged that an entity engaged solely in retail sales of airplanes would not likely depreciate its airplane inventory for tax and accounting purposes because doing so would create unwanted and unnecessary income tax liabilities upon the sale of such aircraft.  Moreover, the parties do not dispute that SAS was primarily engaged in the business of leasing aircraft.  However,  the Department ruled that, considering the ambiguities contained in the record, Branden's weak testimony and evidence that SAS depreciated the inventory in its leasing operation was not sufficient to rebut the 
prima
 
facie
 case that SAS engaged in the sale of aircraft as an adjunct to its primary business of leasing aircraft.  The Department's ruling was not clearly erroneous where SAS had a Florida dealer's license, categorized itself on its federal tax returns as engaged in sales, earned nearly a quarter-million dollars in commissions for some role in helping clients acquire or sell aircraft, and previously sold the Westwind to JM Aviation.

Next, JM Aviation contends that the Department may have relied on evidence that SAS acted as a broker in the sale of airplanes owned by other parties to find that SAS was a retailer.  JM Aviation asserts that evidence that SAS "occasionally" facilitated the sale of property and received payment in the form of a commission did not establish that SAS was a retailer.

As discussed above, the totality of the evidence on which the Department relied established that SAS either held itself out as a seller or aircraft or habitually engaged in such sales.  Branden's testimony that SAS was merely engaged in holding aircraft for the use of Huizenga's other businesses and that SAS's sale of the Gulfstream to JM Aviation was an aberration was contradicted by the evidence.  Specifically, in 1992, only three years before the transaction at issue on appeal, SAS sold to JM Aviation the Westwind JM Aviation sought to exchange for the Gulfstream in 1996.  SAS then promptly resold the Westwind to a third party in 1996.  Thus, SAS sold three airplanes from 1992 through 1996.  Moreover, SAS earned nearly a quarter-million dollars in commissions in 1995 and 1996, and Branden's unsubstantiated testimony failed to establish SAS's role in those transactions.  Branden's unsubstantiated testimony also failed to establish that SAS engaged in retail sales of aircraft only to update its leasing fleet.  The ALJ weighed the conflicting evidence and determined that JM Aviation failed to meet the burden of demonstrating that SAS was not a retailer of aircraft.  This court is not responsible for weighing the evidence anew, and the Department's determination that JM Aviation failed to rebut the 
prima
 
facie
 evidence that SAS was a retailer was not clearly erroneous.

CONCLUSION

The judgment of the circuit court affirming the decision of the Department is affirmed.

Affirmed.

GORDON, P.J., and O'MALLEY, J., concur.