IRWIN INDUSTRIAL TOOL COMPANY, f/k/a American Tool Companies, Inc., as Successor by Merger to ATC Air, Inc., Plaintiff-Appellee v. THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellants.

First District (6th Division) Nos. 1—07—3331, 1—08—0750 cons.

Opinion filed September 11, 2009.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Diane M. Potts, Assistant Attorney General, of counsel), for appellants.

David A. Hughes, of Horwood Marcus & Berk Chtrd., of Chicago, for appellee.

JUSTICE JOSEPH GORDON delivered the opinion of the court:

This appeal concerns an attempt by the defendants, the Illinois Department of Revenue (hereinafter the Department), Brian Hamer, as the Director of Revenue, and Alexei Giannoulias, as the Illinois State Treasurer, to impose a use tax, penalty and interest on the purchase price of an airplane acquired by the plaintiff, ATC Air, Inc. (hereinafter ATC Air), a former subsidiary of Irwin Industrial Tool Co., formerly known as American Tool Companies, Inc. (hereinafter

Irwin). The plaintiff owned the aircraft in question from April 12, 2000, through April 30, 2002 (the relevant time period). Following an audit, the Department issued a notice of tax liability to the plaintiff, assessing $536,950 in taxes based upon the purchase price of the airplane, in addition to $500 in late filing penalties, and $275,869.94 in accrued interest pursuant to section 3 of the Illinois Use Tax Act (UTA) (35 ILCS 105/3 (West 2006)), for a total of $813,319.94. The plaintiff paid the total amount owed to the Department, but did so under protest pursuant to the State Officers and Employees Money Disposition Act (Protest Monies Act) (30 ILCS 230/2a.1 (West 2006)), filing a six-count complaint with the circuit court seeking reimbursement. Only counts III and IV of the plaintiff's six-count complaint are relevant for purposes of this appeal. The remaining counts are still before the trial court. In count III, the plaintiff asserted that the use tax imposed by the Department did not meet the requirements of article I, section 8, of the Constitution, *i.e.*, the commerce clause (U.S. Const., art. I, §8), because there was no substantial nexus between the airplane and Illinois so as to permit the Department to tax the plaintiff's use of the aircraft in this state. Alternatively, in count IV, the plaintiff argued that even if there was a substantial nexus so as to subject the plaintiff to the Illinois use tax, the tax amount imposed by the Department was unconstitutional under the commerce clause (U.S. Const., art. I, §8) because it was not "fairly apportioned," *i.e.*, it was based on the entire purchase price of the airplane, rather than on the plaintiff's actual use of the airplane in Illinois.

After agreeing to stipulated facts, the parties filed cross-motions for summary judgment on counts III and IV of the plaintiff's complaint. The circuit court granted the Department's summary judgment motion on count III, holding that a substantial nexus existed between the aircraft and Illinois so as to subject the plaintiff, as the owner of the aircraft, to Illinois tax liability. The circuit court then went on to grant the plaintiff's motion for summary judgment on count IV, finding that the Department could tax only 4% of the airplane's value based on the percentage of time that the airplane spent on the ground in Illinois. The circuit court subsequently denied the Department's motion to reconsider its decision with respect to count IV, and additionally found that, pursuant to Supreme Court Rule 304(a) (210 Ill. 2d R. 304(a)), there was no just cause for delay in appealing its ruling. Both parties now appeal contending that summary judgment on both counts should have been made in their favor. For the reasons that follow, we affirm in part and reverse in part.

# I. BACKGROUND

## 1. Stipulated Facts

The record below reveals the following stipulated and undisputed facts. Prior to merging with ATC Air, in October 2003, the plaintiff, Irwin, was an international corporation that manufactured and distributed tools through its many domestic and foreign subsidiaries. Irwin's domestic subsidiaries included: (1) American Tool Cos. of Arkansas, Inc. (a manufacturer of screws and nut drive bits located in Lexa, Arkansas, with inventory in Greenfield, Indiana); (2) Bergman Tool Manufacturing Co., Inc. (a manufacturer of tools in Buffalo, New York); (3) Chesco Corp. (a manufacturer of tools in Beatrice, Nebraska, with inventory in Greenfield, Indiana); (4) Peterson Manufacturing Co. (a manufacturer of vices, grip-locking clamps and wrenches in Dewitt, Nebraska, with inventory in Greenfield, Indiana); (5) Peterson Development Corp. (a research and development facility, responsible for inventing the vice-grip in Dewitt, Nebraska); (6) Prosnip Corp. (a manufacturer of cutting tools in Beatrice, Nebraska, with inventory in Greenfield, Indiana); (7) Irwin Co. (a manufacturer of, inter alia, taps, dies, bolt extractors, twist drills, in Gorham, Maine; Cumberland, Wisconsin; and Wilmington, Ohio); (8) Unibit Corp. (a manufacturer of drill bits and pliers in Dewitt, Nebraska, with inventory in Greenfield, Indiana); and (9) ATC Air.

Irwin initially had corporate offices in Nebraska, Florida, Ohio, and Wisconsin. Irwin's worldwide administrative headquarters, including its finance, accounting, marketing, human resources and other administrative departments, as well as executives such as the company's comptroller, were all located in Lincoln, Nebraska. Irwin's office in Kenosha, Wisconsin, eventually became the company's North American headquarters.

In 1995, when Irwin relocated its North American headquarters to Ohio, Irwin's chairman and chief executive officer (CEO), Alan Peterson, opened an office in Hoffman Estates, Illinois.[1] Initially, this office accommodated only Peterson, his secretary and a small administrative staff, but in 2000, Irwin's chief financial officer (CFO), chief operating officer (COO) and general counsel were all moved from the Lincoln, Nebraska, office to the Hoffman Estates office. Consequently, after 2000, of Irwin's seven corporate officers, four had offices in Illinois: (1) CEO, Alan Peterson; (2) COO and president, Jawad Nunes; (3) CFO, Clark Chandler; and (4) corporate vice president (VP) and

---

[1] This office is located at 2800 West Higgins Road in Hoffman Estates, Illinois.

general counsel, William L. Hoese. Of the remaining three officers, two were in Nebraska (assistant treasurers, David Gentry and Tera Beermann), and one was in Del Mar, California (secretary, William Wright). In addition, of Irwin's four corporate directors, two were in Illinois, one was in Nebraska, and one was in California. Nevertheless, in the relevant time period, the Nebraska office remained Irwin's largest office in terms of the number of employees.

Before merging with Irwin, ATC Air was a wholly owned subsidiary of Irwin, incorporated in Nebraska (in 1987), with the sole corporate purpose of providing air transportation services to Irwin and its affiliated companies. Alan Peterson was ATC Air's sole director and its chairman and CEO. ATC Air's other officers were Irwin officers.

ATC Air did not operate as an interstate carrier for hire within the meaning of section 3—60 of the UTA (35 ILCS 105/3—60 (West 2006)). ATC Air maintained all of its business records at its office in Lincoln, Nebraska. Between 2000 and 2002, ATC Air had seven employees including pilots and maintenance workers, all of whom lived and worked in Nebraska.

On December 10, 1999, ATC Air executed an aircraft purchase agreement to acquire a Hawker 800 XP from Raytheon Aircraft Co., located in Wichita, Kansas. Vice president and general counsel Hoese signed the contract on ATC Air's behalf, listing ATC Air's address as 2800 West Higgins Road, in Hoffman Estates, Illinois. The promissory note, guaranty, and security agreement for the aircraft, as well as the trade-in-agreement, reflected the address in Hoffman Estates. The purchase price for the airplane was $7,520,710. ATC Air accepted delivery of the aircraft in Little Rock, Arkansas, and then immediately flew the plane to Lincoln, Nebraska, where it was hangared.

On April 12, 2000, ATC Air registered the aircraft with the Federal Aviation Administration (FAA) by filing an aircraft bill of sale and an aircraft registration application with the FAA. Both documents reflected the Hoffman Estate's office as ATC Air's address. On June 5, 2000, ATC Air filed an amendment to both the aircraft bill of sale and the aircraft registration application changing the address from the Hoffman Estates office to the Lincoln, Nebraska, office. From that point on, ATC Air's registration applications and bills of sale reflected the Nebraska address.

ATC Air owned the airplane from April 12, 2000, through April 30, 2002. The airplane was used for three primary purposes: customer visits, transporting ATC employees from one location to another, and matters relating to acquisitions and lawsuits. The passengers that flew on the aircraft included (1) 77 Irwin employees; (2) 20 customers; (3) 5 officers; (4) 4 directors; (5) 3 outside counsel; (6) 9 outside

consultants and accountants; (7) 1 shareholder/owner; and (8) 6 friends and/or relatives of the foregoing passengers. All maintenance on the aircraft was done in Nebraska.

Between April 12, 2000, and April 30, 2002, from its hangar in Lincoln, Nebraska, the aircraft flew a total of 290 days, flying to locations throughout the United States, Canada, and Mexico, specifically including flights to Illinois. The flight log for this relevant period attached to the stipulated facts by the parties reveals a total of 734 flight segments, of which 269 originated or ended at an Illinois airport.

On April 25, 2002, ATC Air filed a Nebraska personal property tax return and claimed an exemption for the aircraft. ATC Air was not subject to the Nebraska use tax on the aircraft because it qualified as an exempt carrier for Nebraska sales and use tax purposes. ATC Air never filed a sales/use tax return to pay use tax in Illinois on the aircraft.

In the meantime, the Illinois Department of Revenue itself audited the purchase of the aircraft by ATC Air and determined that a use tax was due on the transaction. As a result, on April 7, 2004, the Department issued a notice of tax liability to ATC Air, assessing $536,950 in use tax, $500 in penalties, with $275,869.94 in accrued interest, for a total balance of $813,319.94.

In October 2003, ATC Air merged into Irwin. On behalf of ATC Air, Irwin paid the total amount owed to the Department but did so under protest and timely filed this action pursuant to the Protest Monies Act (30 ILCS 230/2a.1 (West 2002)).

## 2. Procedural History

On June 28, 2004, the plaintiff filed a six-count complaint for declaratory judgment and an injunction against the defendants. In count I, the plaintiff sought a preliminary and permanent injunction to protect the protested funds from being transferred into the Departments' general revenue fund. In count II, the plaintiff asserted that the aircraft was not subject to the Illinois use tax (35 ILCS 105/3 (West 2002)), alleging that it was never used "in this State" within the meaning of section 3 of the UTA (35 ILCS 105/3 (West 2002)) because upon purchase, it was accepted in Little Rock, Arkansas, immediately flown to Lincoln, Nebraska, and never based in Illinois. In count III, the plaintiff alleged that even if the UTA applies, the Department should still be precluded from imposing a use tax on the aircraft under article I, section 8, of the United States Constitution, i.e., the commerce clause (U.S. Const., art. I, §8) because the aircraft did not have a "substantial nexus" to Illinois. In the alternative, in count IV, the plaintiff argued that even if a use tax were permissible, under the

commerce clause (U.S. Const., art. I, §8) the amount assessed by the Department was improper and should have been based on the actual use of the aircraft in Illinois, rather than the total purchase price. In count V, the plaintiff raised a due process argument, challenging the audit procedure used by the Department in auditing Irwin in the midst of the passage of the Tax Delinquency Amnesty Act (35 ILCS 745/10 (West Supp. 2003) (effective October 1, 2003)), which extended the time for collections pursuant to certain requirements, as incentives for voluntary payments.[2] Finally, in count VI, the plaintiff challenged the Tax Delinquency Amnesty Act (35 ILCS 745/10 (West Supp. 2003)) itself as unconstitutional.

On August 10, 2004, the plaintiff made a second payment to the Department under protest in the amount of $6,596.70 representing additional accrued interest, and sought leave to file its first amended complaint. The court granted the plaintiff's request on August 25, 2004. The first amended complaint raised the same arguments as the original but provided additional factual allegations.

The Department was preliminarily enjoined from depositing the protested funds into the general revenue fund, and the parties proceeded with discovery. On January 29, 2007, the parties entered into a stipulation of facts, which has been summarized above, and which included numerous exhibits, as well as the aircraft's flight log for the relevant two-year audit period.

Both parties subsequently moved for summary judgment on counts III and IV, disputing the constitutionality of the use tax based on the commerce clause (U.S. Const., art. I, §8). A hearing on the matter was heard by the circuit court. At that hearing, the plaintiff argued that the court should look to the total time period that the plaintiff owned the aircraft, not just the flight time, to determine whether it had a substantial nexus to Illinois so as to be subject to the Illinois use tax. According to the plaintiff, during the entire period it was owned by the plaintiff, the aircraft spent little of its ground time in Illinois, specifically 639 hours and 41 minutes out of a total of 17,520 hours owned by the plaintiff, i.e., 3.65% of the total time. In addition, the plaintiff alleged that the aircraft did not spend many nights in Illinois; specifically out of a total of 730 nights, the aircraft spent 25 nights in Illinois versus 509 nights in Nebraska, i.e., 3.42% of all of its nights in Illinois. Accordingly, the plaintiff asked that the circuit court find that there was no substantial nexus with Illinois. In the alternative, the

---

[2]As on appeal neither party raises any arguments with respect to the Tax Amnesty Delinquency Act, we need not set forth in any detail the provisions of this Act or the plaintiff's arguments with respect to this statute.

plaintiff argued that the Department's use tax violated the fair apportionment requirement of the commerce clause because it was based on the purchase price of the aircraft rather than the actual time that the aircraft was used by the plaintiff in Illinois.

On the other hand, the Department argued that nexus should be determined by the degree of actual use in flight, rather than by proportionate hangar time. According to the Department, the flight log established that there was a substantial nexus to Illinois because it showed that the aircraft was flown to and/or from Illinois on approximately half of the total days that it was in flight, *i.e.*, of the 290 days the aircraft spent in flight, on 143 days it was at an Illinois airport (49.3% of the total days in flight). In addition, with respect to the amount taxed, the Department asserted that under the plain language of the UTA the amount of tax is to be determined based upon the purchase price or the fair market value of the aircraft and not the percentage of time that the aircraft was used in Illinois. 35 ILCS 105/3—10 (West 2002). The Department argued that in requiring "fairly apportioned" taxes, the commerce clause of the United States Constitution (U.S. Const., art. I, §8) is primarily concerned with preventing multiple taxation by different states, which is not an issue in this case, as the aircraft was never taxed in Nebraska, or in any other state for that matter. In addition, the Department argued that its notice of tax liability constitutes *prima facie* proof under the law of the amount of tax owed and that the burden was on the plaintiff to establish with competent evidence that the Department had made an error.

After hearing all the arguments, on July 9, 2007, the circuit court entered a written memorandum order and decision granting the Departments' motion for summary judgment on count III of the plaintiff's complaint, but granting the plaintiff's motion for summary judgment on count IV. Based upon its own analysis, the circuit court first found a substantial nexus existed between the aircraft and Illinois so as to permit the Department to impose a use tax. However, the circuit court went on to conclude that the amount of tax imposed on the plaintiff was erroneously ascertained because it had been based on the full purchase price of the aircraft. The circuit court held that because "the fair apportionment prong of the commerce clause limits any tax the Department can impose to a value that reflects the amount of time the [aircraft] was actually in Illinois," the "more equitable solution would be [to] tax only the percentage of actual use the aircraft was in Illinois, in this case approximately 4%."

After the circuit court's original decision, the Department filed a timely motion for reconsideration of count IV. On October 23, 2007,

the circuit court issued a memorandum decision and judgment denying the Department's motion for reconsideration reiterating that a use tax on the full purchase price of the aircraft was unconstitutional. The parties appealed separately but their appeals were consolidated. The plaintiff appeals the circuit court's ruling on count III of its first amended complaint, and the Department appeals the circuit court's ruling on count IV.

## II. ANALYSIS

At the outset, we note that we review the circuit court's decision to grant or deny a motion for summary judgment *de novo*. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2004); see also *Fidelity National Title Insurance Co. of New York v. Westhaven Properties Partnership*, 386 Ill. App. 3d 201, 212 (2007), citing *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d at 315. A genuine issue of material fact exists where the facts are in dispute or where reasonable minds could draw different inferences from the undisputed facts. *In re Estate of Ciesiolkiewicz*, 243 Ill. App. 3d 506, 510 (1993). " 'When all parties file cross-motions for summary judgment, the court is invited to decide the issues presented as a question of law.' " *Weber-Stephen Products, Inc. v. Department of Revenue*, 324 Ill. App. 3d 893, 898 (2001), quoting *Container Corp. of America v. Wagner*, 293 Ill. App. 3d 1089, 1091 (1997).

### 1. The Illinois Use Tax

In Illinois, the taxation scheme commonly known as the "sales tax" is comprised of two complementary statutes, the Retailers' Occupation Tax Act (ROTA) (35 ILCS 120/1 *et seq.* (West 2002)) and the UTA (35 ILCS 105/1 *et seq.* (West 2002)). *Hagerty v. General Motors Corp.*, 59 Ill. 2d 52, 54-55 (1974); *Brown v. Zehnder*, 295 Ill. App. 3d 1031, 1034 (1998). The ROTA imposes a retailer's occupational tax "upon persons engaged in the business of selling at retail tangible personal property." 35 ILCS 120/2 (West 2002). Under the ROTA, Illinois retailers are required to remit to the State a percentage of the gross receipts of every retail sale. *Weber-Stephen Products, Inc.*, 324 Ill. App. 3d at 898. The UTA, which is central to this appeal, "is assessed in the same way and on the same transactions, but *** imposes a tax on the purchaser-user of the property for the privilege of using this property in Illinois, regardless of where the sale occurred." *Weber-Stephen Products, Inc.*, 324 Ill. App. 3d at 898; see also 35 ILCS 105/3

(West 2002) ("A [use] tax is imposed upon the privilege of using in this State tangible personal property purchased at retail from a retailer"). "The State therefore benefits by taxing in-state retailers and purchases and also out-of-state purchases by consumers for use in Illinois which could not be reached by the ROTA." *Weber-Stephen Products, Inc.*, 324 Ill. App. 3d at 898; see also *Brown's Furniture, Inc. v. Wagner*, 171 Ill. 2d 410, 418 (1996), quoting *Klein Town Builders, Inc. v. Department of Revenue*, 36 Ill. 2d 301, 303 (1966) (noting that the purpose of the use tax is " 'primarily to prevent avoidance of the [retailers' occupation] tax by people making out-of-State purchases, and to protect Illinois merchants against such diversion of business to retailers outside Illinois' ").

The use tax is complementary to the retailers' tax because of the way in which the use tax is assessed and collected. *Weber-Stephen Products, Inc.*, 324 Ill. App. 3d at 898. The UTA expressly provides that its provisions do not apply to out-of-state transactions that would be exempt under the ROTA if the sale had occurred in Illinois. 35 ILCS 105/3—65 (West 2002). The UTA also contains a credit provision stating that a taxpayer is exempt from paying the Illinois use tax for the use of property purchased outside of Illinois, if a sales or use tax on that property has already been assessed by and paid to another state. 35 ILCS 105/3—55(d) (West 2002); see also *Container Corp. of America*, 293 Ill. App. 3d at 1092-93. Moreover, although the use tax is a tax on the user-purchaser, it is generally collected by the retailer-seller, who is then permitted a credit to the extent that he has remitted the retailers' tax (ROTA) for the same transaction to the Department of Revenue. *Weber-Stephen Products, Inc.*, 324 Ill. App. 3d at 898; see also 35 ILCS 105/9 (West 2002) (stating that if the retailer pays the retailers' tax (ROTA) it does not have to pay the use tax (UTA)); see also *Brown v. Zehnder*, 295 Ill. App. 3d at 1034, quoting *Department of Revenue v. Steinkopf*, 160 Ill. App. 3d 1008, 1014 (1987) ("when a single purchase and sale occurs, two taxes are assessed [a retailers' tax and a use tax], but 'only one of the two payments is remitted to the State, and the single payment satisfies both taxes' "). Our courts have explained that this arrangement:

> "(1) assures that each transaction involving the sale for use of personal property to an Illinois entity is taxed, regardless of where the purchase occurs, (2) simplifies tax accounting, particularly since the ROTA and UTA taxes are assessed at the same base rate [citation], and (3) gives the Department the advantage of pursuing unpaid sales tax by enforcement action against either the seller of personal property (ROTA) or its purchaser-user (UTA)." *Container Corp. of America*, 293 Ill. App. 3d at 1093 (citing *Mobil Oil Corp. v.*

*Johnson*, 93 Ill. 2d 126, 135 (1982); *People v. Buffalo Confectionery Co.*, 78 Ill. 2d 447, 460 (1980); *Klein Town Builders, Inc.*, 36 Ill. 2d at 303-04; and 86 Ill. Adm. Code §150.301 (1994)).

Where, as here, the retailer is located outside of Illinois and therefore has no UTA or ROTA obligations, the purchaser-user in Illinois must pay the use tax directly to the state. *American River Transportation Co. v. Bower*, 351 Ill. App. 3d 208, 210 (2004), citing *Weber-Stephen Products, Inc.*, 324 Ill. App. 3d at 898. However, the use tax is "a nonrecurrent tax; once the tax is paid, the owner of the property may use it in Illinois, continuously or intermittently, without incurring a further use tax." *Philco Corp. v. Department of Revenue*, 40 Ill. 2d 312, 320 (1968). Under the UTA, "use" is defined as "the exercise by any person of any right or power over tangible personal property incident to the ownership of that property." 35 ILCS 105/2 (West 2000). The use tax is imposed "at the rate of 6.25% of either the selling price or the fair market value, if any, of the tangible personal property." 35 ILCS 105/3—10 (West 2002).

## 2. Constitutional Limits on the Illinois Use Tax

The present case concerns the restraints that article I, section 8, of the United States Constitution, *i.e.*, the commerce clause (U.S. Const. art. I, §8), places on Illinois's ability to impose a use tax on the purchase of an aircraft that was bought in a different state, but that is being used by the plaintiff in Illinois. Article I, section 8, of the United States Constitution expressly authorizes Congress to "regulate Commerce with foreign Nations, and among the several States." U.S. Const., art. I, §8. The United States Supreme Court has consistently interpreted this *express* grant of congressional authority as implicitly containing a negative command, known as the dormant commerce clause, which limits the power of the state to tax interstate commerce even in the absence of congressional legislation. See *Quill Corp. v. North Dakota*, 504 U.S. 298, 309, 119 L. Ed. 2d 91, 104, 112 S. Ct. 1904, 1911 (1992), quoting *South Carolina State Highway Department v. Barnwell Brothers, Inc.*, 303 U.S. 177, 185, 82 L. Ed. 734, 739, 58 S. Ct. 510, 514 (1938) ("the Commerce Clause is more than an affirmative grant of power; it has a negative sweep as well. The Clause *** 'by its own force' prohibits certain state actions that interfere with interstate commerce"); *Northwestern States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458, 3 L. Ed. 2d 421, 427, 79 S. Ct. 357, 362 (1959); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 534-35, 93 L. Ed. 865, 872, 69 S. Ct. 657, 663-64 (1949); see also *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179-80, 131 L. Ed. 2d 261, 268, 115 S. Ct. 1331, 1335-36 (1995) (noting that this construc-

tion serves "the Commerce Clause's purpose of preventing a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear").

■ Over the years, the United States Supreme Court's interpretation of the dormant commerce clause has substantially changed, so that today dormant commerce clause analysis does not prohibit all state taxation of interstate commerce but rather only that which is unduly restrictive or discriminatory. See *Jefferson Lines, Inc.*, 514 U.S. at 179-80, 131 L. Ed. 2d at 268, 115 S. Ct. at 1335. Under contemporary dormant commerce clause law, to withstand an allegation that it has unconstitutionally burdened interstate commerce, a state tax must satisfy the four-part test articulated in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977). Under this standard, a state tax on interstate commerce must: (1) be applied to an activity that has a substantial nexus with the taxing state; (2) be fairly apportioned; (3) not discriminate against interstate commerce; and (4) be fairly related to the services provided by the state. *Complete Auto Transit, Inc.*, 430 U.S. at 279, 51 L. Ed. 2d at 331, 97 S. Ct. at 1079; see also *Geja's Café v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 254-56 (1992). "The party raising a commerce clause challenge to a state tax scheme carries the burden of persuasion." *Town Crier, Inc. v. Department of Revenue*, 315 Ill. App. 3d 286, 292 (2000), citing *Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 164, 77 L. Ed. 2d 545, 552, 103 S. Ct. 2933, 2939-40 (1983).

In the present case, the parties dispute whether the use tax imposed by the Department on the plaintiff's purchase of the aircraft met the first two prongs of the *Complete Auto* test. We begin by addressing the substantial nexus requirement.

### 3. Substantial Nexus

The plaintiff asserts that the trial court erred when it found that as a matter of law the aircraft had a substantial nexus to Illinois as required under the first prong of the *Complete Auto* test, so as to permit the Department to impose a use tax on its purchase. Specifically, the plaintiff contends that the constitutional test is a *substantial* nexus and not merely any nexus. The plaintiff contends that because its principal place of business is in Nebraska, and because the aircraft it purchased was permanently based, hangared, and maintained in Nebraska, only making brief visits to Illinois to drop off or pick up passengers, while continually moving in interstate commerce, thereby spending a nominal amount of time (less than 4% of its total ground

time) in Illinois, there is no substantial nexus between the aircraft and Illinois so as to permit the Department to impose a use tax on it. For the reasons that follow, we disagree.

■ We start by noting that the "substantial nexus" requirement imposed by the commerce clause on a state's ability to tax an out-of-state entity is not simply like the "minimum contacts" requirement, imposed under the due process clause out of concerns for fairness to the individual taxpayer, but rather is a construct designed to limit a state's ability to burden interstate commerce. See *Quill*, 504 U.S. at 312, 119 L. Ed. 2d at 106, 112 S. Ct. at 1913 (the "nexus requirement [is] informed not so much by concerns about fairness for the individual defendant as by structural concerns about the effects of state regulation on the national economy"). For a use tax to meet the substantial nexus requirement, so that the taxing state has a sufficient connection with the use of the property being taxed, the "taxpayer must substantially avail itself of the privilege of doing business in the taxing state," by having some physical presence there. 68 Am. Jur. 2d *Sales & Use Taxes* §188 (2009); *Quill*, 504 U.S. at 306-08, 119 L. Ed. 2d at 102-04, 112 S. Ct. at 1909-10; see also *Brown's Furniture, Inc.*, 171 Ill. 2d at 423. The question of sufficient physical presence will necessarily depend upon the circumstances of each case. See *Brown's Furniture, Inc.*, 171 Ill. 2d at 424-25; see also *Quill*, 504 U.S. at 330-31, 119 L. Ed. 2d at 118-19, 112 S. Ct. at 1921 (White, J., concurring in part and dissenting in part) (conceding that "[r]easonable minds surely can *** differ over what showing is required to make out a 'physical presence' adequate to justify imposing responsibilities for use tax collection. *** [I]t is a sure bet that the vagaries of 'physical presence' will be tested to their fullest in our courts").

There is some authority for the proposition that a substantial nexus can be established by showing a sufficient physical connection between the taxpayer and the taxing state, without necessitating a showing of that same connection with respect to the activity or use of the property being taxed and the taxing state. See, *e.g.*, 68 Am. Jur. 2d *Sales & Use Taxes* §188 (2009) ("The required nexus can be either between the out-of-state entity being taxed and the taxing state, or between the activity that the state seeks to tax and the taxing state"); see also *Brown's Furniture Inc.*, 171 Ill. 2d at 423, quoting *Orvis Co. v. Tax Appeals Tribunal*, 86 N.Y.2d 165, 178, 654 N.E.2d 954, 960-61, 630 N.Y.S.2d 680, 686-87 (1995) (a taxpayer's presence " 'may be manifested by the presence in the taxing State of the [taxpayer's] property or the conduct of economic activities in the taxing State performed by the [taxpayer's] personnel or on its behalf' "); see generally *Quill*, 504 U.S. at 306-08, 119 L. Ed. 2d at 102-04, 112 S. Ct. at

1909-10. However, in *Allied-Signal, Inc. v. Director, Division of Taxation*, 504 U.S. 768, 778, 119 L. Ed. 2d 533, 546, 112 S. Ct. 2251, 2258 (1992), the United States Supreme Court seemed to indicate that a connection has to be established both between the state and the taxpaying entity being taxed, as well as the state and the activity (*i.e.*, use of the property) that it seeks to tax. See *Allied-Signal, Inc.*, 504 U.S. at 778, 119 L. Ed. 2d at 546, 112 S. Ct. at 2258 ("[a]lthough our modern due process jurisprudence rejects a rigid, formalistic definition of minimum connection, we have not abandoned the requirement that, in the case of a tax on an activity, there must be a connection to the activity itself, rather than a connection only to the actor the State seeks to tax").

In either event, as shall be discussed more fully below, in the present case, the substantial nexus requirement is sufficiently established both with respect to the taxpayer and the use of the taxpayer's property in Illinois.

With respect to the taxpayer's physical presence within the state, Illinois courts have consistently held that to satisfy the substantial nexus requirement, physical presence inside the taxing state need not be substantial, but must be more than "slight." See *Brown's Furniture, Inc.*, 171 Ill. 2d at 423-24, citing *Quill*, 504 U.S. at 306-08, 119 L. Ed. 2d at 102-04, 112 S. Ct. at 1909-10, and quoting *Orvis Co.*, 86 N.Y.2d at 178, 654 N.E.2d at 960-61, 630 N.Y.S.2d at 686-87 (rejecting the plaintiff's contention that the physical connection to the state must be substantial and holding that instead the physical presence must be " 'demonstrably more than a "slightest presence" ' "); see also *Bower*, 351 Ill. App. 3d at 211 ("physical presence must be more than 'slight' but need not actually be 'substantial' "); *Town Crier, Inc.*, 315 Ill. App. 3d at 292-93 (same).

Following this same principle, with respect to the connection between the taxed activity (*i.e.*, use of tangible property) and the taxing state, Illinois courts have found a substantial nexus so as to justify an imposition of a use tax in a variety of situations where the activity (*i.e.*, use of some tangible property) inside the state was "more than slight." See, *e.g.*, *Archer Daniels Midland Co. v. Department of Revenue*, 170 Ill. App. 3d 1014, 1022-23 (1988) (substantial nexus found for imposition of use tax on interstate aircraft, purchased outside of Illinois, because the plane was hangared in Illinois); *Square D Co. v. Johnson*, 233 Ill. App. 3d 1070, 1080 (1992) (same); *Bower*, 351 Ill. App. 3d at 211 (holding that Illinois had a substantial nexus to impose a use tax on fuel purchased by tugboat operator in Missouri and used to power tugboats in Illinois because the tugboats spent "at least 50% of their time plying waterways contained within the State of Illinois").

While we acknowledge that all of these decisions relied on relatively extensive physical presence of the property within the state as a factor in establishing nexus, none of them reject the notion that other factors, in addition to time spent, may be considered in determining the extent of physical presence, *i.e.*, the use of the property in the state. Indeed, physical presence is not gauged simply by its duration, but by its significance in relation to the overall use and function of the property within the state.

While no Illinois decisions involving such other considerations have been brought to our attention by the parties, the decision of the Missouri Supreme Court in *Director of Revenue v. Superior Aircraft Leasing Co.*, 734 S.W.2d 504, 506-08 (Mo. 1987), is directly on point. In that case, the Missouri Supreme Court had occasion to address a case factually similar to the cause at bar and found that Missouri could properly assess a use tax on an aircraft purchased and hangared outside of Missouri where the aircraft routinely flew to and from Missouri to transport corporate officers. In that case, the aircraft was purchased and delivered in Kansas by a Missouri corporation with its principle place of business in Ohio, whereupon it was hangared and regularly maintained in Ohio. *Superior Aircraft Leasing*, 734 S.W.2d at 506. When the Missouri Department of Revenue attempted to impose a use tax on the purchase of the aircraft, the corporation objected contending that the aircraft lacked a substantial nexus to Missouri. *Superior Aircraft Leasing*, 734 S.W.2d at 506. The Missouri Supreme Court disagreed, holding that the aircraft had a substantial nexus to Missouri because 17.7% of the total flight hours for the aircraft were logged on flights to and from Missouri and were recorded as being for board meetings of the Missouri corporation. *Superior Aircraft Leasing*, 734 S.W.2d at 507.

■ Similarly, in the present case, even though the plaintiff's aircraft was hangared and maintained outside of Illinois, the aircraft's flight log, stipulated to by the parties, established that in the relevant two-year time period, the aircraft made 290 takeoffs and landings at Illinois airports, which included flights in and out of Illinois on nearly half of the days for which any flights were made. In fact, the flight log established that one-third of the total flight segments for the aircraft were logged on flights to and from Illinois, albeit some of those flights included landings in other places as well as Illinois. In addition, according to the flight log the aircraft was present overnight at one of Illinois's four airports on 25 occasions.

Moreover, in the present case, the record demonstrates that throughout the relevant two-year period, the aircraft frequently and regularly flew to Illinois at the behest of the plaintiff's corporate offi-

cers to pick them up or drop them off at destinations throughout the United States. In that respect, the record reveals that the aircraft was initially purchased to provide transportation services for the plaintiff's executives and employees, and in fact did so, often transporting the plaintiff's top three executives (the CEO, Alan Peterson; the president and COO, Jawad Nunes; and the general counsel and corporate VP, William Hoese) to and from Illinois. In fact, when the aircraft was initially purchased by the plaintiff's then-subsidiary, ATC Air, the sole corporate purpose of ATC Air was to provide transportation services to the plaintiff's officers and employees. Moreover, when the aircraft was initially purchased, the purchase agreement, as well as the bill of sale and registration application filed with the FAA, all listed the Illinois corporate office as ATC Air's primary address. Thus, whatever physical presence the plane had with Illinois, through the many takeoffs and landings from Illinois runways, as well as the nights that it spent in Illinois, was not merely coincidental, but was inherently connected to its basic purpose and function in this state. As such, the plaintiff cannot now legitimately contend that by purchasing and using the aircraft in the manner that it did, it did not avail itself of the privilege of doing business in Illinois, so as to be subject to the Illinois use tax. *National Geographic Society v. California Board of Equalization*, 430 U.S. 551, 561, 51 L. Ed. 2d 631, 640, 97 S. Ct. 1386, 1393 (1977); *Standard Pressed Steel Co. v. Department of Revenue*, 419 U.S. 560, 562, 42 L. Ed. 2d 719, 722, 95 S. Ct. 706, 708-09 (1975); *Superior Aircraft Leasing*, 734 S.W.2d at 507.

Plaintiff attempts to distinguish *Superior Aircraft Leasing* by pointing out that the airplane in that case occasionally spent several days or approximately a week in Missouri (see *Superior Aircraft Leasing*, 734 S.W.2d at 507). However, this consideration was not paramount to the time the airplane spent in flight between Missouri and other destinations, which emphasized the true significance of the aircraft's presence inside the state, as it related to its purpose, function and use. Nor can we ignore, as already noted above, that in the present case, in addition to the time spent in takeoffs and landings on Illinois runways, the plaintiff's aircraft did in fact spend 25 full nights in Illinois.

The plaintiff also attempts to distinguish *Superior Aircraft Leasing* by contending that in that case the taxpayer was a corporation based in Missouri, and therefore had obvious contacts with the state so as to meet the substantial nexus requirement, whereas, in this case, the plaintiff is neither based nor has a principle place of business in Illinois. We find this distinction unpersuasive.

Although it is undisputed here that the plaintiff's principal place of business is in Nebraska, the record establishes that the plaintiff had a demonstrated physical corporate presence in Illinois. In fact, of the plaintiff's seven corporate officers, four of the top executives are based and work from offices in Illinois: (1) the CEO, Alan Peterson; (2) the president and COO, Jawad Nunes; (3) the CFO, Clark Chandler; and (4) the corporate VP and general counsel, William Hoese. The United States Supreme Court has consistently held that this quantity of in-state corporate presence by a company not based in the taxing state is sufficient to satisfy the substantial nexus requirement. See, e.g., *Standard Pressed Steel Co.*, 419 U.S. at 562, 42 L. Ed. 2d at 708, 95 S. Ct. at 708-09 (upholding a gross receipts tax imposed on the in-state sales of an out-of-state corporation, even though the company had only a single full-time employee working from his home in that state, because that one full-time employee "made possible the realization and continuance of valuable contractual relations" between the company and another large in-state corporation); *National Geographic Society*, 430 U.S. at 561, 51 L. Ed. 2d at 640, 97 S. Ct. at 1393 (holding that a magazine's maintenance of two offices in California, regardless of the purpose of those offices, adequately established a substantial nexus between the magazine and the state; noting that the fact that there was no relationship between the magazine's solicitation of advertising through its two California offices and the magazine's mail order business, which was run from an office in the District of Columbia, did not preclude California from imposing a use tax with respect to mail order sales to California residents because those offices had the advantage of the same municipal services as they would have had if their activities had included assistance to the mail order operations); *D.H. Holmes Co. v. McNamara*, 486 U.S. 24, 33, 100 L. Ed. 2d 21, 29, 108 S. Ct. 1619, 1624-25 (1988) (holding that, *inter alia*, a company's 13 stores inside the state, together with its mail order catalog system sent to in-state residents so as to increase its sales within the state, was sufficient physical presence to establish the requisite nexus).

In fact, the United States Supreme Court has invalidated a state tax only where the in-state presence of the out-of-state corporation has been truly *de minimis*, such as where the only connection between the out-of-state corporation and the taxing state is by common carrier or the United States mail. *General Motors Corp. v. City & County of Denver*, 990 P.2d 59, 67 (Colo. 1999); see, *e.g.*, *Quill*, 504 U.S. at 317-18, 119 L. Ed. 2d at 109-10, 112 S. Ct. at 1915-16 (holding that a mail order business which had no physical presence in the state, except for mailings that it sent to the state, lacked a substantial nexus with the

state so as to permit the state to collect a use tax); *United Air Lines, Inc. v. Mahin*, 410 U.S. 623, 631, 35 L. Ed. 2d 545, 553, 93 S. Ct. 1186, 1191-92 (1973) (stating in *dicta* that a state would have an insufficient nexus to tax an airplane's consumption of fuel based solely on the aircraft's flight over the state); *National Bellas Hess, Inc. v. Department of Revenue*, 386 U.S. 753, 758-60, 18 L. Ed. 2d 505, 509-10, 87 S. Ct. 1389, 1393-94 (1967) (holding that a state had an insufficient nexus to require an out-of-state mail order firm to collect and pay use taxes where the firm's only contacts with the state constituted catalogs and merchandise mailed to state residents), *overruled in part on other grounds by Quill*, 504 U.S. at 310-12, 119 L. Ed. 2d at 105-06, 112 S. Ct. at 1912-13.

Accordingly, we find that there was a sufficient physical connection between both the taxpayer and the taxable property with Illinois, so as to meet the threshold requirements of "substantial nexus" and permit the Department to impose a use tax on the sale of the aircraft. We now turn to the fair apportionment contention.

### 4. Fair Apportionment

On appeal, the Department contends that the circuit court erred when it found as a matter of law that the use tax imposed on the plaintiff and calculated based upon the entire value of the aircraft violated the "fair apportionment" prong of the *Complete Auto* test, so as to invalidate the tax. We agree.

■ As already noted above, under the second prong of the *Complete Auto* test, in order to survive constitutional scrutiny, a state tax on interstate commerce must be fairly apportioned. *Complete Auto Transit*, 430 U.S. at 279, 51 L. Ed. 2d at 331, 97 S. Ct. at 1079. The purpose of the apportionment prong is to prevent multiple taxation, "which is threatened whenever one State's act of overreaching combines with the possibility that another State will claim its fair share of the value taxed: the portion of value by which one State exceeded its fair share would be taxed again by a State properly laying claim to it." *Jefferson Lines*, 514 U.S. at 184-85, 131 L. Ed. 2d at 271, 115 S. Ct. at 1338. In order to determine whether a state tax is fairly apportioned, the courts examine whether the tax is internally and externally consistent. *Jefferson Lines*, 514 U.S. at 185, 131 L. Ed. 2d at 271, 115 S. Ct. at 1338; see also *Goldberg v. Sweet*, 488 U.S. 252, 261, 102 L. Ed. 2d 607, 617, 109 S. Ct. 582, 589 (1989); see also *Container Corp. of America*, 463 U.S. at 169, 77 L. Ed. 2d at 556, 103 S. Ct. at 2942.

According to the United States Supreme Court, to be internally consistent, a tax must be so structured that if every state in the United States were to impose an identical tax, it would not result in an object

being burdened by multiple taxation. *Goldberg*, 488 U.S. at 261, 102 L. Ed. 2d at 617, 109 S. Ct. at 589. However, the United States Supreme Court has repeatedly held that this requirement is solved by a system of credits, which exempts the taxpayer to the extent that he has already paid the same tax in another state. See, *e.g.*, *Goldberg*, 488 U.S. at 262, 102 L. Ed. 2d at 617, 109 S. Ct. at 589; *Jefferson Lines*, 514 U.S. at 185, 131 L. Ed. 2d at 271, 115 S. Ct. at 1338; see also *Tyler Pipe Industries, Inc. v. Washington State Department of Revenue*, 483 U.S. 232, 245 n.13, 97 L. Ed. 2d 199, 212 n.13, 107 S. Ct. 2810, 2819 n.13 (1987) (noting that "[m]any [s]tates provide tax credits that alleviate or eliminate the potential multiple taxation that results when two or more sovereigns have jurisdiction to tax parts of the same chain of commercial events"). With respect to use taxes, in particular, the Supreme Court has specifically held that credit provisions in state use tax statutes prevent multiple taxation because they:

> " 'create a national system under which the first state of purchase or use imposes the tax. Thereafter, no other state taxes the transaction unless there has been no prior tax imposed ... or if the tax rate of the prior taxing state is less, in which case the subsequent taxing state imposes a tax measured only by the differential rate.' " *Jefferson Lines*, 514 U.S. at 194-95, 131 L. Ed. 2d at 277-78, 115 S. Ct. at 1343, quoting *KSS Transportation Corp. v. Baldwin*, 9 N.J. Tax 273, 285 (1987).

See also 2 J. Hellerstein & W. Hellerstein, *State Taxation* ¶18.08[1] (1992) (noting that the District of Columbia and 44 of the 45 states that impose sales and use taxes permit such a credit or exemption for similar taxes paid to other states).

In the present case, the plaintiff concedes that the use tax imposed on the full value of the aircraft was internally consistent because the Illinois UTA contains a credit provision, exempting the taxpayer from liability on the use or sales tax amount already owed and paid in another state (see 35 ILCS 105/3—55(d) (West 2000)).[3] The plaintiff nevertheless contends that the use tax was externally inconsistent.

---

[3]Section 3—55 of the UTA states in pertinent part:

"To prevent actual or likely multistate taxation, the tax imposed by this Act does not apply to the use of tangible personal property in this State under the following circumstances:

\* \* \*

(d) The use, in this State, of tangible personal property that is acquired outside this State and caused to be brought into this State by a person who has already paid a tax in another State in respect to the sale, purchase, or use of that property, to the extent of the amount of

External consistency looks to the degree of relationship between the taxing state and the entity that it wants to tax "to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State." *Jefferson Lines,* 514 U.S. at 185, 131 L. Ed. 2d at 272, 115 S. Ct. at 1338; *Hunt-Wesson, Inc. v. Franchise Tax Board,* 528 U.S. 458, 464, 145 L. Ed. 2d 974, 981, 120 S. Ct. 1022, 1026 (2000). The plaintiff asserts that because the plane was permanently hangared and maintained in Nebraska, and traveled to more than 30 states and jurisdictions, spending less than 4% of its ground time in Illinois (specifically only 3.65% of its total ground time, and only 3.42% of its total overnight stays), a tax on the full value of the aircraft does not fairly reflect the "in-state component of the activity being taxed." Accordingly, the plaintiff argues that the circuit court properly determined that the Department could only tax 4% of the aircraft's value. We disagree.

In that respect, we first note that "[n]o internally consistent tax has failed the external consistency test for lack of further apportionment." *General Motors Corp.,* 990 P.2d at 71, citing *Jefferson Lines,* 514 U.S. at 192, 131 L. Ed. 2d at 276, 115 S. Ct. at 1341-42; see also *Goldberg,* 488 U.S. at 264, 102 L. Ed. 2d at 619, 109 S. Ct. at 590-91; *D.H. Holmes Co.,* 486 U.S. at 31, 100 L. Ed. 2d at 27, 108 S. Ct. at 1623-24. In fact, the majority of courts that have had the opportunity to address this issue have held that the availability of credits obviates the need for any further apportionment in the sense of a division of the tax base. See, *e.g., Goldberg,* 488 U.S. at 264, 102 L. Ed. 2d at 619, 109 S. Ct. at 590-91; *Archer Daniels Midland,* 170 Ill. App. 3d at 1022; *Whitcomb Construction Corp. v. Commissioner of Taxes,* 144 Vt. 466, 467, 479 A.2d 164, 165 (1984); *General Motors Corp.,* 990 P.2d 59; *Miller v. Commissioner of Revenue,* 359 N.W.2d 620, 621 (Minn. 1985), *cert. denied,* 471 U.S. 1116, 86 L. Ed. 2d 260, 105 S. Ct. 2359 (1985). The rationale of these courts has been threefold: (1) the use tax is by its very nature a one-time tax imposed upon a discrete event (the purchase of the tangible property) for the privilege of unlimited use of that property in state; (2) any apportionment of the use tax will be administratively burdensome; and (3) if there is to be apportionment, the prerogative to require it is with the legislators and not the courts. Implicit in these cases is the acknowledgment that while a system of tax credits resolves the problem of multiple taxation, it also satisfies the requirement of external consistency, when, as we have determined here, the taxing state has a substantial nexus to the property and the taxpayer to permit the imposition of the use tax in the first place.

---

the tax properly due and paid in the other State." 35 ILCS 105/3—55(d) (West 2006).

In *Archer Daniels Midland*, 170 Ill. App. 3d at 1022-23, a case factually similar to the cause at bar, the Illinois Appellate Court rejected the taxpayer's contention that it should not be taxed on the full value of three aircrafts purchased outside of Illinois, but rather that the tax should be based upon the proportion of takeoffs and landings from or in Illinois compared to total flight takeoffs and landings. *Archer Daniels Midland*, 170 Ill. App. 3d at 1022. The appellate court further rejected the taxpayer's argument that flight segments that have no connection with Illinois should not be taxed, because they are not related to any service provided by Illinois, and taxing the full purchase price in essence taxes the plaintiff for activities unrelated to the state. *Archer Daniels Midland*, 170 Ill. App. 3d at 1022. In holding that the Department could impose a use tax on the full value of the aircrafts, the appellate court explained:

"[The plaintiff] has not claimed that it paid taxes on its planes elsewhere; therefore, it has not been subject to multistate taxation. The sales and use taxes are complementary and equalize the burden on interstate and intrastate transactions. The sales tax is measured by the purchase price of an item, without regard to the amount of use the item will receive, and so is the use tax. Nor is the use tax a precise charge for benefits provided by the state. [The plaintiff] enjoys the protection of Illinois laws, access to its legal system, and innumerable other services. Because [the plaintiff] receives all these benefits, it is properly subject to taxation in this State." *Archer Daniels Midland*, 170 Ill. App. 3d at 1022.

Similarly, in *Whitcomb Construction Corp.*, 144 Vt. at 467, 479 A.2d at 165, the Vermont Supreme Court upheld Vermont's imposition of a use tax on the full value of a New Hampshire-owned aircraft that spent 17% of its flight time in Vermont. In doing so, the Vermont Supreme Court overruled the circuit court's decision to apportion the taxpayer's liability based on the amount of time the aircraft spent in Vermont. *Whitcomb Construction Corp.*, 144 Vt. at 467, 479 A.2d at 165. The court specifically held:

"The Commerce Clause does not require apportionment in addition to a tax credit. The rule of *Complete Auto* *** requiring a tax on interstate commerce to be 'fairly apportioned' is satisfied here. The state has provided a tax credit in lieu of apportionment. This credit, not unlike a proportionate tax, eliminates the possibility of cumulative use tax liability. The Vermont legislature has chosen not to incorporate apportionment within the use tax scheme. This Court, therefore, is without power to impose such a requirement. [Citation.] We agree with the Commissioner that apportionment of this tax is neither constitutionally required nor legislatively authorized." *Whitcomb Construction Corp.*, 144 Vt. at 473, 479 A.2d at 168.

This rationale is even more sharply enunciated in *General Motors Corp.*, 990 P.2d 59, where the Colorado Supreme Court addressed the external consistency of a municipal use tax imposed upon a car manufacturer for the use of vehicles in a municipality. Although the car manufacturer urged the court to apportion the use taxes on the automobiles given their temporary and minor use in Colorado, the court held that "apportionment of this tax [would be] neither constitutionally required nor legislatively authorized." *General Motors*, 990 P.2d at 72. The court specifically found that "the external consistency requirement does not require that sales and use taxes be apportioned based on the length of time tangible property remains in the taxing jurisdiction." *General Motors*, 990 P.2d at 72.

The court first explained that the use tax by its very nature is paid once and compensates for a sale that took place in another jurisdiction, so that the time frame during which the property remains in the jurisdiction becomes irrelevant. *General Motors*, 990 P.2d at 72. The court then found that "apportionment of sales and use taxes would present substantial administration and collection difficulties." *General Motors*, 990 P. 2d at 71, citing 2 J. Hellerstein & W. Hellerstein, State Taxation ¶18.04[1] (1992). The court acknowledged that apportionment by percentage would make sense in the context of income or gross receipts taxes, which are based upon annual income derived from the use of the property within the state in the past tax year, and where the location of revenue collection must be accounted for. See, *e.g.*, *Central Greyhound Lines, Inc. v. Mealey*, 334 U.S. 653, 661-64, 92 L. Ed. 1633, 1640-42, 68 S. Ct. 1260, 1265-66 (1948) (permitting New York to impose a gross receipts tax on an interstate bus line but limiting the tax amount to the number of miles that the bus line actually traveled through New York on fair apportionment grounds). However, the court also found that percentage apportionment would not apply to sales or use taxes, because these are one-time, prospective, privilege taxes, which cannot practically be apportioned. *General Motors*, 990 P.2d at 71, quoting *KSS Transportation Corp.*, 9 N.J. Tax at 284 (" 'Due to the nature of the sales an use tax, it is impractical to apportion this tax' "). Consequently, the court concluded:

> "[U]se taxes are externally consistent if the contested tax contains a credit that operates to eliminate multiple taxation. This rule holds true regardless of how long the property remains in the taxing jurisdiction. If the use tax in question contains an effective credit, it is externally consistent. *** [W]e decline to impose an apportionment requirement where the responsible legislative body has chosen not to enact one." *General Motors*, 990 P.2d at 72-73.

The Minnesota Supreme Court similarly rejected a circuit court's apportionment of a use tax in *Miller*, 359 N.W.2d at 621. In that case, a North Dakota resident who owned farmland straddling the Minnesota-North Dakota border, with approximately 68% of the land in Minnesota, bought $750,000 worth of farm equipment in North Dakota that was used in both states. When Minnesota imposed a use tax on the full value of the farm equipment, the taxpayer sued contending that Minnesota could only assess a use tax on 68% of the purchase price to reflect his in-state use of the equipment. *Miller*, 359 N.W.2d at 621. The circuit court agreed with the taxpayer and allowed a *pro rata* reduction in use tax liability to reflect the estimated proportional in-state use of the equipment and therefore assessed a use tax on only 68% of the purchase price. The Minnesota Supreme Court disagreed and reversed the circuit court's decision. In doing so, the court held:

> "[A]ny 'exercise of a right or power incidental to ownership' within the state constitutes a use sufficient to impose full use tax liability [citations], even when the property is located and used within the state for only brief periods of the year. [Citations.] *** '[E]ven a very brief and limited use *** is sufficient to justify the imposition of the tax.' [Citation.] *** [T]his construction also comports with the purpose for which use tax is imposed. By complementing the sale tax, the use tax eliminates incentive to make major purchases in states with a lower sales tax. [Citation.] This purpose would be substantially frustrated if the allocation formula adopted by the Tax Court were allowed to stand." *Miller*, 359 N.W.2d at 621-22.

Other jurisdictions throughout the United States have followed the same rationale and refused to require apportionment of use taxes where a system of credits is already in place. See, *e.g.*, *Superior Aircraft Leasing*, 734 S.W.2d at 507 (rejecting claim that a use tax on a corporate aircraft used both interstate and intrastate had to be apportioned); *PPG Industries, Inc. v. Tracy*, 74 Ohio St. 3d 449, 452, 659 N.E.2d 1250, 1251 (1996) (rejecting claim that use tax on pace cars used 10% of time in state had to be apportioned; noting that credit system was in place and that the plaintiff had been credited for the taxes already paid in other states); *H.K. Porter, Inc. v. Commonwealth*, 111 Pa. Commw. 463, 466, 534 A.2d 169, 171 (1987) (rejecting claim that use tax on corporate aircraft used both interstate and intrastate had to be apportioned); *Service Merchandise Co. v. Jackson*, 735 S.W.2d 443, 445 (Tenn. 1987) (rejecting claim that use tax on a corporate plane used both interstate and intrastate had to be apportioned based solely on the time that the aircraft was flown intrastate); *Cole Bros. Circus, Inc. v. Huddleston*, No. 01—A—01—9301—CH00004 (M.D.

Tenn. June 4, 1993) (holding that a use tax imposed on the full value of a traveling circus's equipment was proper and need not be apportioned by days the equipment was used in the state).

We note that in opposition to this overwhelming precedent, the plaintiff cites to only one Alabama case, *Boyd Brothers Transportation v. State Department of Revenue*, 976 So. 2d 471 (Ala. App. 2007), where the appellate court held that a circuit court should be permitted to apportion the amount of use tax imposed by the state on the purchase price of trucks, based upon the number of miles that the trucks actually traveled within the state. We find, however, that this case deviates from the decision of its own supreme court, which expressly rejected an apportionment claim where a credit system was in place. See *Ex Parte Fleming Foods of Alabama, Inc.*, 648 So. 2d 577 (Ala. 1994). In *Fleming Foods*, the Alabama Supreme Court held that it was not necessary to apportion a use tax on a fleet of vehicles that traveled through Alabama only 38% of their mileage, because " '[t]he provision of a credit in a use tax statute for sales or use tax paid to another state ma[de] [the] use tax externally consistent.' " *Fleming Foods*, 648 So. 2d at 579-80, quoting 68 Am. Jur. 2d *Sales & Use Tax* §188 (1973). The court further noted that there was no need for apportionment as "[t]he use tax is not a recurring annual tax, but is a one-time tax levied at the same rate as the sales tax and is complementary to the sales tax," and was "not imposed upon revenues derived from carrying on an interstate business or interstate commerce, but [rather was] intended to prevent one from avoiding the sales tax law." *Fleming Foods*, 648 So. 2d at 579-80. Moreover, while *Boyd Brothers*, cited to by the plaintiff, was decided after *Fleming Foods*, the decision itself did not involve, discuss, or attempt to resolve the issue of apportionment in lieu of credit provisions. *Boyd Brothers*, 976 So. 2d 471.

Consequently, in light of the overwhelming precedent supporting the view that to meet the external consistency requirement, a use tax need not be apportioned so long as a credit provision is in place, we find that the circuit court erred when at the request of the plaintiff it limited the use tax to 4% of the value of the aircraft. In that respect, we note that, just as in the aforementioned cases, our legislature has provided for a flat 6.25% use tax on the purchase price of any tangible property being used in Illinois (see 35 ILCS 105/3—10 (West 2002) (the use tax is imposed "at the rate of 6.25% of either the selling price or the fair market value, if any, of the tangible personal property")), and that it is not the burden or proper function of the courts to modify the tax rate imposed by the legislature when the legislative and constitutional requirements are otherwise met (see *People v. Warren*, 173 Ill. 2d 348, 355 (1996) (it is not the function of the judiciary to

determine "whether a statute is wise or desirable," but "[r]ather, it is wholly for the legislature to balance the advantages and disadvantages of legislation")).

Moreover, in this case particularly, we find that to permit the court to attempt to apportion the use tax on the basis of the actual usage of the aircraft in Illinois would prove both burdensome and impracticable. In that respect, we note that unlike apportionment formulas based on the number of miles a bus, train or truck has traveled within a taxing jurisdiction, which have been endorsed by the United States Supreme Court (see *Goldberg*, 488 U.S. at 264-65, 102 L. Ed. 2d at 618-19, 109 S. Ct. at 590-91 (endorsing apportionment of a tax on "large physical objects over identifiable routes, where it was practicable to keep track of the distance actually traveled within the taxing State")), determining the usage of an aircraft within a state is far more elusive. Specifically, the parties below themselves disputed the method by which the court should determine the "use" of the aircraft in Illinois. On the one hand, the plaintiff asserted that the court should measure use by the ground time that the aircraft spent in Illinois (*i.e.*, 3.65% of ground time, or 3.42% of its total overnight stays in Illinois). The Department on the other hand would have had the court measure the use of the aircraft based upon the flight segments to and from Illinois which would establish that the aircraft made over 200 takeoffs and landings at Illinois airports (*i.e.*, with more than 30% of the flights originating or ending in Illinois and nearly 50% of the total days flown being in Illinois).

## III. CONCLUSION

Accordingly, for all of the foregoing reasons, we affirm the judgment of the circuit court with respect to count III and reverse the judgment with respect to count IV of the plaintiff's amended complaint.

Affirmed in part and reversed in part with directions to restore to the Department the full tax at the statutory rate without apportionment.

McBRIDE, and HOWSE[4], JJ., concur.

---

[4]This opinion was initially oraled on May 28, 2009, before Justices Joseph Gordon, Margaret Stanton McBride, and Denise O'Malley. In the interim between oral arguments and the filing of this opinion, Justice Denise O'Malley retired, thereby necessitating the substitution of Justice Nathaniel Howse, Jr., to replace Justice O'Malley. Justice Howse has read the briefs and record and has listened to the tape of the oral argument.